IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

---

JON DOUGLAS HALL,                         )
                                          )
              Petitioner,                 )
                                          )
V.                                        )      No. 05-1199-JDB-egb
                                          )
RICKY BELL, Warden,                       )
RIVERBEND MAXIMUM SECURITY                )
INSTITUTION,                              )
                                          )
              Respondent.                 )

---

ORDER DENYING PETITION PURSUANT TO 28 U.S.C. § 2254
ORDER GRANTING IN PART AND DENYING IN PART
RESPONDENT'S MOTION FOR SUMMARY JUDGMENT
ORDER DENYING REQUEST FOR ORAL ARGUMENT
ORDER OF DISMISSAL
ORDER DENYING CERTIFICATE OF APPEALABILITY
AND
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH

---

On July 14, 2005, Petitioner Jon Douglas Hall, Tennessee Department of Corrections ("TDOC") prisoner number 238941, a death-sentenced inmate at the Riverbend Maximum Security Institution ("RMSI") in Nashville, Tennessee, filed a pro se habeas corpus petition under 28 U.S.C. § 2254, a motion for leave to proceed in forma pauperis, and a motion to appoint counsel. (Docket Entries ("D.E.") 1-4.) On December 1, 2005, the Court entered an order appointing counsel. (D.E. 5.) On December 5, 2005, the Court granted Petitioner in forma pauperis status. (D.E. 6.) On December 16, 2005, Respondent filed a motion for service of the petition. (D.E. 10.) The Court granted the motion on December 19,

2005.  (D.E. 11.)  On December 29, 2005, an agreed scheduling order
was entered.  (D.E. 13.)

On April 3, 2006, Petitioner submitted an amended petition for
writ of habeas corpus, (D.E. 15) and on July 10, 2006, Respondent
filed his answer.  (D.E. 19.)  On July 12, 2006, Respondent filed
the state court record manually.  (See D.E. 21.)  On July 20, 2006,
a second agreed scheduling order was entered.  (D.E. 22.)

On June 19, 2007, Petitioner filed a motion to amend the
habeas petition and the amended petition.  (D.E. 53 & 54.)  The
motion was granted on June 20, 2007 (D.E. 63) and on September 4,
2007, Respondent filed his answer.  (D.E. 69.)  On September 7,
2007, Petitioner filed a reply to the answer to amended petition.
(D.E. 71.)

On October 2, 2008, the Court conducted a telephonic status
conference, denied Petitioner's oral motion for further discovery,
and granted counsel ninety (90) days to file dispositive motions.
(D.E. 85 & 86.)  On December 31, 2008, Respondent filed a motion
entitled "Respondent's Motion for Judgment on the Pleadings" which
the Court construes as a motion for summary judgment.[1]  (D.E. 90.)

---

[1]Respondent relies on the state court record which is evidence outside the
pleadings.  "[T]he mere presentation of evidence outside of the pleadings, absent
the district court's rejection of such evidence, is sufficient to trigger the
conversion of a Rule 12(c) motion to a motion for summary judgment."  Max Arnold
& Sons, LLC v. W.L. Hailey & Co., Inc., 452 F.3d 494, 502 (6th Cir. 2006); see
Fed. R. Civ. P. 12(d)("If, on a motion under Rule 12(b)(6) or 12(c), matters
outside the pleadings are presented to and not excluded by the court, the motion
must be treated as one for summary judgment under Rule 56"); see also Hauck v.
Mills, 941 F. Supp. 683, 686-87 (M.D. Tenn. 1996)(discussing the appropriateness
of summary judgment motions in habeas proceedings).

On August 31, 2009, Petitioner filed a response, in which he requested oral argument, and a notice of filing the exhibits in support of the response. (D.E. 100 & 102.)

I.   <u>STATE COURT PROCEDURAL HISTORY</u>

On February 5, 1997, Hall was convicted of first-degree murder in the Circuit Court of Madison County, Tennessee for the 1994 death of his estranged wife Billie Jo Hall and sentenced to death. <u>State v. Hall</u>, No. 02C01-9703-CC-00095, 1998 WL 208051, at *1 (Tenn. Crim. App. Apr. 29, 1998). On April 29, 1998, the Tennessee Court of Criminal Appeals affirmed the conviction and sentence. <u>Id.</u> at *16. On November 15, 1999, the Tennessee Supreme Court affirmed. <u>State v. Hall</u>, 8 S.W.3d 593 (Tenn. 1999). The United States Supreme Court denied the petition for writ of certiorari on October 2, 2000. <u>Hall v. Tennessee</u>, 531 U.S. 837 (2000). The petition for post-conviction relief was denied in the state courts. <u>Hall v. State</u>, No. W2003-00669-CCA-R3-PD, 2005 WL 22951 (Tenn. Crim. App. Jan. 5, 2005), <u>perm. app. denied</u> (Tenn. June 20, 2005). The denial of the state court petition for habeas corpus relief was affirmed by the Tennessee Court of Criminal Appeals. <u>Hall v. State</u>, No. M2005-00572-CCA-R3-HC, 2006 WL 2000502 (Tenn. Crim. App. July 19, 2006), <u>perm. app. denied</u> (Tenn. Nov. 27, 2006). Hall's petition for writ of error *coram nobis* was denied. <u>Hall v. State</u>,

---

The motion for further discovery was denied, and this case became ripe for disposition as of the October 2, 2008 telephonic status conference. Therefore, the Court finds that no additional notice was needed for Petitioner to appropriately respond to the motion.

No. W2007-02656-CCA-R3-PD, 2009 WL 1579243 (Tenn. Crim. App. June

5, 2009), perm. app. denied (Tenn. Nov. 23, 2009).

To assess the Petitioner's claims, it is necessary briefly to

set forth the proof from the trial in the Circuit Court, as found

by the Tennessee Court of Criminal Appeals:

> The petitioner and the victim were married, and the
> victim had two daughters, Jennifer and Cynthia, from a
> previous relationship of the victim. The couple had two
> more daughters, Stephanie and Jessica. The youngest,
> Jessica, suffered from cerebral palsy. In 1994, the
> victim and the petitioner began having marital problems
> and were living separately.
>
> On the night of July 29, 1994, the petitioner went to the
> victim's house to discuss a reconciliation. He brought
> a $25.00 money order made out to the victim as a payment
> toward child support. Prior to entering the house, the
> petitioner disconnected the telephone line at the utility
> box on the outside wall of the house. When the victim
> answered the door, the petitioner pushed his way into the
> room where she and the children were watching television.
> The petitioner told the girls to go to bed. When they
> did not immediately obey his order, the petitioner tipped
> over the chair in which the victim was sitting. The
> petitioner and the victim went back into her bedroom.
> The children, who had gone into their bedrooms, could
> hear "[t]hings slamming around" and their parents yelling
> at each another. When the children tried to enter the
> room, they found the door blocked. The three oldest
> children, Jennifer, Cynthia and Stephanie, persisted in
> their efforts to get into the room and finally succeeded.
> They attempted to stop the petitioner from hurting their
> mother. Cynthia jumped on the petitioner's back and bit
> him. This did not stop the petitioner's attack. When
> the victim told the children to go to a neighbor's house,
> the petitioner told them that if they went for help, "he
> was going to kill Mama." He also told the victim, a
> college student, that she would never live to graduate.
> Cynthia and Stephanie tried to use the telephone to call
> for help, but they discovered the telephones would not
> work. At that point, they went to a neighbor's house
> where they called 9-1-1. Jennifer, the oldest child, was
> the last to leave the house, carrying her sister Jessica.

Before she left, she saw her mother and the petitioner leave the bedroom and go outside. She watched the petitioner drag her mother, "kicking and screaming," to the small pool in the back yard.

The first officer to arrive on the scene was Chief Jerry Bingham of the Henderson County Sheriff's Department. Upon his arrival, he found the victim's body floating face down in the water. He immediately called Emergency Medical Services and a Tennessee Bureau of Investigation (TBI) investigator. TBI Agent Brian Byrd arrived on the scene shortly after midnight.

Agent Byrd entered the house and found the master bedroom in disarray. Bloodstains marked the bed, a counter top, and a wedding dress. The telephones inside the house were off their hooks. A $25.00 money order made out to the victim and dated the day of the murder was found inside the house. No weapons were found. A trail of drag marks and bloodstains led from the master bedroom, out the front door, over the driveway, past the sandbox, and down to the pool in the back yard. The victim's t-shirt was lying beside the pool. Clumps of grass ripped from the ground floated in the blood-tinged water of the pool. Outside the front door of the house the telephone junction box was opened, and the telephone line was disconnected. The grass and weeds near this box were matted down.

Dr. O'Brien Clay Smith, the forensic pathologist who performed the autopsy, testified that the primary cause of death was asphyxia resulting from a combination of manual strangulation and drowning. He could not say with certainty that either strangulation or drowning was the exclusive cause of death. Evidence supporting strangling as a contributing cause of death included bruising on the left and right sides of the victim's neck, hemorrhaging in the neck muscles around the hyoid bone in the neck, and bleeding in the thyroid gland, which indicated that extensive compression had been applied to the neck. Evidence supporting drowning as a contributing cause of death was water found in both the victim's stomach and in her bloodstream.

Before dying, the victim sustained at least eighty-three separate wounds, including several blows to the head, a fractured nose, multiple lacerations, and bruises and abrasions to the chest, abdomen, genitals, arms, legs and

back.   Abrasions on the victim's back were consistent
with having been dragged across pavement.   Dr. Smith
described some of the injuries to the victim's arms, legs
and hands as defensive wounds.   He characterized the
injuries to the neck, face and head as intentional
"target" wounds.   Except for the physical trauma
associated with the strangulation, however, none of the
injuries would have proven fatal.

Chris Dutton, who was confined in a cell next to the
petitioner, testified that while both men were
incarcerated, the petitioner confided in him about his
wife's murder.   When describing what happened on the
night of the murder, the petitioner told Dutton that he
had tried to talk with the victim about reconciling but
"[a]ll she was interested in was the money."   When she
refused to consider his plea for reconciliation and
demanded that he leave, "his temper got the best of him
and he began to strike her."   According to Dutton, the
petitioner had determined, even before he arrived at his
wife's house, "to make her feel as he did.   He wanted her
to suffer as he did, feel the helplessness that he was
feeling because she took his world away from him."   The
petitioner told Dutton that he hit his wife in the head
until he panicked, threw her in the swimming pool, then
reentered the house, took the car keys, and drove away in
the victim's minivan.

On cross-examination, Dutton admitted that the petitioner
told him that he was depressed and had been drinking
since he telephoned his wife earlier that day.   The
petitioner also told Dutton that he was very concerned
about the welfare of his two daughters, especially
Jessica.   The petitioner explained that he disconnected
the telephone line because when he and his wife argued in
the past, she had called the police.

Two witnesses testified on the petitioner's behalf during
the guilt phase of trial.   Dr. Lynn Donna Zager, a
clinical psychologist, interviewed the petitioner several
times after his arrest.   She diagnosed him as depressed
and suffering from alcohol dependence. In addition, she
noted personality characteristics of paranoia and
dependency.   In Dr. Zager's opinion, at the time of the
killing, the petitioner suffered from depression and
alcohol intoxication.   These factors were compounded by
his personality characteristics and various psycho-social
stressors, including a sick child, loss of employment

6

with the resulting financial problems, his impending divorce, and the terminal illness of a brother.  Dr. Zager testified that, in her opinion, the petitioner acted in an impulsive manner in killing his wife, rather than pursuant to a preconceived plan.

On cross-examination, Dr. Zager admitted that she based her opinion concerning the petitioner's intoxicated state on statements he made to her and statements of other witnesses who saw him drinking on the day of the murder. She agreed that no one she interviewed remarked on whether the petitioner exhibited any of the typical physical signs of intoxication, such as slurred speech or lack of coordination.

Randy Helms, the petitioner's prior employer, also testified on behalf of the petitioner.  Mr. Helms said that before the killing, the petitioner had been severely depressed because of his family problems.

The petitioner attempted to call his sister, Sheryl Arbogast, to testify regarding his state of mind at the time of the murder, but she had no first-hand knowledge of the petitioner's state of mind on the night of the murder.  In fact, Ms. Arbogast admitted she had not spoken to the petitioner for several months before the murder.  Her testimony regarding the petitioner's state of mind was based on a conversation she had with her brother, Jeff Hall, since deceased, on the day of the murder.  The trial court would not permit this hearsay testimony to be admitted before the jury.  At the conclusion of the evidence, the jury found the petitioner guilty of first degree premeditated murder.

During the sentencing phase the state recalled Dr. Smith to testify in more detail concerning the extent of the victim's injuries.  The state introduced photographs of the injuries taken at the autopsy to illustrate Dr. Smith's testimony.  These photographs depicted the numerous external wounds the petitioner inflicted while struggling with the victim.

The petitioner called Dr. Zager and Dr. Joe Mount, a psychological examiner who counseled the petitioner at Riverbend Maximum Security Institution.  Both described the petitioner as depressed, remorseful, suicidal, and extremely concerned about his children.  Dr. Mount testified that the petitioner had been diagnosed as

suffering from an adjustment disorder with mixed
emotional features (anxiety and depression) and
"substance abuse of dependence by history."

Randy Helms also testified again.  He described the
petitioner as a good, dependable employee and told how
the petitioner had cared for his children when he brought
them to work with him.  Helms stated that the petitioner
loved his wife and children and had hoped to reconcile
with the victim.

The petitioner also presented his three sisters and his
mother to recount the history of the petitioner and his
family.  The petitioner was the youngest of seven
children.  His father, an alcoholic, physically and
verbally abused his wife until he died from a heart
attack in 1974 when the petitioner was ten.  The
petitioner's father denied that the petitioner was his
son and snubbed the petitioner.  The witnesses'
descriptions of the fights between the petitioner's
parents eerily paralleled the petitioner's final
confrontation with his own wife. All of the petitioner's
relatives described him as a good father who loved his
children.

<u>Hall</u>, 2005 WL 22951, at **1-4.

## II.  <u>PETITIONER'S FEDERAL HABEAS CLAIMS</u>

Hall raises the following claims:

1.   The conviction and death sentence violate the Sixth,
     Eighth and Fourteenth Amendments to the United States
     Constitution because they are void (D.E. 15 at 48);

2.   The prosecution's decision to seek the death penalty was
     not guided by a standard and violates the Sixth, Eighth
     and Fourteenth Amendments to the United States
     Constitution (<u>id.</u>);

3.   Petitioner was incompetent to stand trial (<u>id.</u> at 49);

4.   The state withheld material, exculpatory evidence (<u>id.</u> at
     49-50);

5.   The state knowingly presented perjured testimony and
     false evidence at trial and relied on that testimony in
     closing argument (<u>id.</u> at 50-52);

8

6.    The trial court did not receive a knowing and voluntary waiver of Petitioner's right to testify (<u>id.</u> at 52);

7.    The jury was prejudiced by improper extraneous influences (<u>id.</u> at 52-53);

8.    The conviction and death sentence are based on false evidence (<u>id.</u> at 53-54);

9.    The trial judge gave the jury unconstitutional instructions (<u>id.</u> at 54);

10.   The application of the heinous, atrocious, or cruel aggravating circumstance violated the Sixth, Eighth and Fourteenth Amendments to the United States Constitution (<u>id.</u> at 55);

11.   The trial judge did not exercise impartial, independent judgment in Petitioner's trial proceedings (<u>id.</u>)

12.   The evidence is insufficient to support Petitioner's conviction of intentional, premeditated, first-degree murder (<u>id.</u>);

13.   Ineffective assistance of counsel (<u>id.</u> at 55-61);

14.   Petitioner is actually innocent of intentional, deliberate, premeditated, first-degree murder (<u>id.</u> at 61);

15.   The State disregarded Petitioner's rights accorded by international law (<u>id.</u> at 61-66);

16.   The Tennessee appellate courts' proportionality review violated the Sixth, Eighth and Fourteenth Amendments to the United States Constitution (<u>id.</u> at 66);

17.   Petitioner is incompetent to be executed (<u>id.</u> at 66-67);

18.   Death by lethal injection and/or electrocution constitutes cruel and unusual punishment (<u>id.</u> at 67-73);

19.   The death sentence violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution (<u>id.</u> at 73); and

20. The cumulative effect of constitutional errors renders Petitioner's first-degree murder conviction and death sentence unconstitutional (<u>id.</u>).

III. <u>ANALYSIS OF THE MERITS</u>

A. <u>Waiver and Procedural Default</u>

Twenty-eight U.S.C. § 2254(b) states, in pertinent part:

(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that --

   (A) the applicant has exhausted the remedies available in the courts of the State; or

   (B) (i) there is an absence of available State corrective process;  or

       (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

(2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

A habeas petitioner must first exhaust available state remedies before requesting relief under § 2254.  <u>See, e.g.</u>, <u>Granberry v. Greer</u>, 481 U.S. 129, 133-34 (1987); <u>Rose v. Lundy</u>, 455 U.S. 509, 519 (1982); Rule 4, Rules Governing Section 2254 Cases in the United States District Courts ("Section 2254 Rules").  A petitioner has failed to exhaust his available state remedies if he has the opportunity to raise his claim by any available state procedure. 28 U.S.C. § 2254(c); <u>Preiser v. Rodriquez</u>, 411 U.S. 475, 477, 489-90 (1973).

10

To exhaust his state remedies, the petitioner must have presented the very issue on which he seeks relief from the federal courts to the courts of the state that he claims is wrongfully confining him. Picard v. Connor, 404 U.S. 270, 275-76 (1971); Rust v. Zent, 17 F.3d 155, 160 (6th Cir. 1994). "[A] claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief." Gray v. Netherland, 518 U.S. 152, 162-63 (1996). "'[T]he substance of a federal habeas corpus claim must first be presented to the state courts.'" Id. at 163 (quoting Picard, 404 U.S. at 278). A habeas petitioner does not satisfy the exhaustion requirement of 28 U.S.C. § 2254(b) "by presenting the state courts only with the facts necessary to state a claim for relief." Id.

Conversely, "[i]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." Gray, 518 U.S. at 163. When a petitioner raises different factual issues under the same legal theory, he is required to present each factual claim to the highest state court in order to exhaust his state remedies. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987). A petitioner has not exhausted his state remedies if he has merely presented a particular legal theory to the courts without presenting each

11

factual claim.  Pillette, 824 F.2d at 497-98.  Each claim must be presented to the state courts as a matter of federal law.  "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made."  Anderson v. Harless, 459 U.S. 4, 6 (1982) (internal citation omitted); see also Duncan v. Henry, 513 U.S. 364, 366 (1995) (per curiam) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court").

The state court decision must rest primarily on federal law. Coleman v. Thompson, 501 U.S. 722, 734-35 (1991).  If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred by this procedural default from seeking federal habeas review.  Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977).  However, the state-court decision need not explicitly address the federal claims; instead, it is enough that the petitioner's brief squarely presents the issue.  Smith v. Digmon, 434 U.S. 332 (1978) (per curiam).

When a petitioner's claims have never been actually presented to the state courts, but a state procedural rule prohibits the state court from extending further consideration to them, the

12

claims are deemed exhausted, but procedurally barred. <u>Coleman</u>, 501 U.S. at 752-53; <u>Teague v. Lane</u>, 489 U.S. 288, 297-99 (1989); <u>Wainwright</u>, 433 U.S. at 87-88; <u>Rust</u>, 17 F.3d at 160.

A petitioner confronted with either variety of procedural default must show cause for the default and prejudice to obtain federal court review of his claim. <u>Teague</u>, 489 U.S. at 297-99; <u>Wainwright</u>, 433 U.S. at 87-88. Cause for a procedural default depends on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. <u>Coleman</u>, 501 U.S. at 752-53; <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986).

A petitioner may avoid the procedural bar, and the necessity of showing cause and prejudice, by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750 (internal citations and quotation marks omitted). The petitioner must show that "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995) (quoting <u>Murray</u>, 477 U.S. at 496). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." <u>Schlup</u>, 513 U.S. at 327.

The conduct of Petitioner's post-conviction proceedings was governed by the then-current version of Tennessee's Post-Conviction

13

Procedure Act, Tennessee Code Annotated §§ 40-30-101 to -122.  That act specified types of procedural default that might bar a state court from reviewing the merits of a constitutional claim.  A one-year statute of limitations governed the filing of petitions. Tenn. Code Ann. § 40-30-102.  The statute also stated a standard by which state courts were to determine whether to consider the merits of post-conviction claims:

> Upon receipt of a petition in proper form, or upon receipt of an amended petition, the court shall examine the allegations of fact in the petition. If the facts alleged, taken as true, fail to show that the petitioner is entitled to relief or fail to show that the claims for relief have not been waived or previously determined, the petition shall be dismissed. The order of dismissal shall set forth the court's conclusions of law.

Tenn. Code Ann. § 40-30-106(f).[2]

The Sixth Circuit has upheld the dismissal of a Tennessee prisoner's habeas petition as barred by a procedural default caused

---

[2]Section 40-30-106 continued:

(g)   A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:

(1)   The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or

(2)   The failure to present the ground was the result of state action in violation of the federal or state constitution.

(h)   A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

by failing to file within the Tennessee statute of limitations on post-conviction relief.  Hannah v. Conley, 49 F.3d 1193, 1194-96 (6th Cir. 1995) (construing pre-1995 statute and stating "the language of Tenn[essee] Code Ann[otated] § 40-30-102 is mandatory").  In this case, Petitioner's right to file any further state post-conviction petition is barred by the one-year statute of limitations and, therefore, he does not have the option of returning to state court to exhaust any claim presented in this § 2254 petition.

B.  Legal Standard for Merits Review

The standard for reviewing a habeas petitioner's constitutional claims on the merits is stated in 28 U.S.C. § 2254(d).  That section provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This Court must determine whether the state court adjudications of the claims that were decided on the merits were "contrary to" or an "unreasonable application of" "clearly established" federal law as

15

Case 1:05-cv-01998-JDB-ego   Document 170   Filed 04/14/10   Page 16 of 134

determined by the United States Supreme Court.  This Court must also determine whether the state court decision on each issue was based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding.

The Supreme Court has issued a series of decisions setting forth the standards for applying § 2254(d)(1).[3]  In <u>(Terry) Williams v. Taylor</u>, 529 U.S. 362, 404 (2000), the Supreme Court emphasized that the "contrary to" and "unreasonable application of" clauses should be accorded independent meaning.  A state-court decision may be found to violate the "contrary to" clause under two circumstances:

> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent. Accordingly, in either of these two scenarios, a federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's "contrary to" clause.

<u>Williams</u>, 529 U.S. at 405-06 (citations omitted); <u>see also</u> <u>Price v. Vincent</u>, 538 U.S. 634, 640 (2003) (same); <u>Lockyer v. Andrade</u>, 538 U.S. 63, 73 (2003) (same); <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002)

---

[3]By contrast, there is little case law addressing the standards for applying § 2254(d)(2).

(same).[4]  The Supreme Court has emphasized the narrow scope of the "contrary to" clause, explaining that "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406; see also id. at 407 ("If a federal habeas court can, under the 'contrary to' clause, issue the writ whenever it concludes that the state court's *application* of clearly established federal law was incorrect, the 'unreasonable application' test becomes a nullity.") (emphasis in original).

A federal court may grant the writ under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." Cone, 535 U.S. at 694; see also Andrade, 538 U.S. at 75 (same); Williams, 529 U.S. at 408-09 (same).[5]  "[A]n *unreasonable*

---

[4]The Supreme Court has noted that this standard "does not require citation of our cases —- indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (emphasis in original).

[5]Although the Supreme Court in Williams recognized, in dicta, the possibility that a state-court decision could be found to violate the "unreasonable application" clause when "the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," the Supreme Court expressed a concern that "the classification does have some problems of precision." Williams, 529 U.S. at 407-08. The Williams Court concluded that it was not necessary "to decide how such 'extension of legal principle' cases should be treated under § 2254(d)(1)." Id. at 408-09. In Yarborough v. Alvarado, 541 U.S. 652, 666 (2004), the Supreme Court stated:

Section 2254(d)(1) would be undermined if habeas courts introduced

application of federal law is different from an *incorrect* application of federal law." Williams, 529 U.S. at 410 (emphasis in original).[6] "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409.[7]

Section 2254(d)(1) refers to "clearly established" federal law, "as determined by the Supreme Court of the United States." This provision "expressly limits the source of law to cases decided by the United States Supreme Court." Harris v. Stovall, 212 F.3d

---

rules not clearly established under the guise of extensions to existing law. Cf. Teague v. Lane, 489 U.S. 288 (1989). At the same time, the difference between applying a rule and extending it is not always clear. Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.

[6]See also Andrade, 538 U.S. at 75 (lower court erred by equating "objectively unreasonable" with "clear error"; "[t]hese two standards, however, are not the same. The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness"); Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam) (holding that the lower court "did not observe this distinction [between an incorrect and an unreasonable application of federal law], but ultimately substituted its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d)"); Cone, 535 U.S. at 698-99 ("For [a habeas petitioner] to succeed . . . , he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly"); Williams, 529 U.S. at 411 ("Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable").

[7]See also Brown v. Payton, 544 U.S. 133, 147 (2005) ("Even were we to assume the '"relevant state-court decision applied clearly established federal law erroneously or incorrectly,"' . . . there is no basis for further concluding that the application of our precedents was 'objectively unreasonable.'") (citations omitted).

18

940, 943 (6th Cir. 2000), reh'g and suggestion for reh'g en banc
denied (July 7, 2000). As the Sixth Circuit has explained:

> This provision marks a significant change from the
> previous language by referring only to law determined by
> the Supreme Court. A district court or court of appeals
> no longer can look to lower federal court decisions
> in deciding whether the state decision is contrary to, or an
> unreasonable application of, clearly established federal
> law.

Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1999), reh'g and
suggestion for reh'g en banc denied (Jan. 21, 1999) (citing 17A C.
Wright, A. Miller & E. Cooper, Federal Practice and Procedure §
4261.1 (2d ed. Supp. 1998)); see also Harris, 212 F.3d at 944 ("It
was error for the district court to rely on authority other than
that of the Supreme Court of the United States in its analysis
under § 2254(d)."). In determining whether a rule is "clearly
established," a habeas court is entitled to rely on "the holdings,
as opposed to the dicta, of [the Supreme] Court's decisions as of
the time of the relevant state-court decision." Williams, 529 U.S.
at 412.

There is almost no case law about the standards for applying
§ 2254(d)(2), which permits federal courts to grant writs of habeas
corpus where the state court's adjudication of a petitioner's claim
"resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in
the State court proceeding." In a decision applying this standard,
the Supreme Court observed that § 2254(d)(2) must be read in

conjunction with 28 U.S.C. § 2254(e)(1), which provides that a state court's factual determinations are presumed to be correct unless rebutted by clear and convincing evidence. <u>Miller-El v. Dretke</u>, 545 U.S. 231, 240 (2005).[8]  It appears that the Supreme Court has, in effect, incorporated the standards applicable to the "unreasonable application" prong of § 2254(d)(1). <u>Rice v. Collins</u>, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination.").  That is consistent with the approach taken by the Sixth Circuit, which has stated that

> a federal habeas court may not grant habeas relief under
> § 2254(d)(2) simply because the court disagrees with a
> state trial court's factual determination.  Such relief
> may only be granted if the state court's factual
> determination was "objectively unreasonable" in light of
> the evidence presented in the state court proceedings.
> Moreover . . . , the state court's factual determinations
> are entitled to a presumption of correctness, which is
> rebuttable only by clear and convincing evidence.

<u>Young v. Hofbauer</u>, 52 F.App'x 234, 236 (6th Cir. 2002) (citing 28 U.S.C. § 2254(e)(1));[9] <u>see also</u> <u>Matthews v. Ishee</u>, 486 F.3d 883, 889 (6th Cir.), <u>cert. denied</u>, 552 U.S. 1023 (2007) (same); <u>Stanley v. Lazaroff</u>, 82 F.App'x 407, 416-17 (6th Cir. 2003) (same).

    C.    <u>Summary Judgment Standard</u>

---

[8]<u>But cf.</u> <u>Rice v. Collins</u>, 546 U.S. 333, 338-39 (2006) (recognizing that it is unsettled whether there are some factual disputes where § 2254(e)(1) is inapplicable).

[9]<u>See also</u> <u>Sumner v. Mata</u>, 449 U.S. 539, 546-47 (1981) (applying presumption of correctness to factual determinations of state appellate courts).

Summary judgment shall be rendered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). As the Supreme Court has articulated:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (citation omitted).

Under Rule 56(e)(2), "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must —- by affidavits or as otherwise provided in this rule -— set out specific facts showing a genuine issue for trial." In considering a motion for summary judgment, "the evidence as well as the inferences drawn therefrom must be read in the light most favorable to the party opposing the motion." Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986) (citations

omitted); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>
<u>Corp.</u>, 475 U.S. 574, 587-88 (1986) (same).

A genuine issue of material fact exists "if the evidence
[presented by the nonmoving party] is such that a reasonable jury
could return a verdict for the nonmoving party." <u>Anderson v.</u>
<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see also</u> <u>id.</u> at 252
("The mere existence of a scintilla of evidence in support of the
plaintiff's position will be insufficient; there must be evidence
on which the jury could reasonably find for the plaintiff.  The
judge's inquiry, therefore, unavoidably asks whether reasonable
jurors could find by a preponderance of the evidence that the
plaintiff is entitled to a verdict"); <u>Matsushita</u>, 475 U.S. at 586
("When the moving party has carried its burden under Rule 56(c),
its opponent must do more than simply show that there is some
metaphysical doubt as to the material facts") (footnote omitted).
The Court's function is not to weigh the evidence, judge
credibility, or in any way determine the truth of the matter,
however.  <u>Liberty Lobby</u>, 477 U.S. at 249.  Rather, the inquiry is
"whether the evidence presents a sufficient disagreement to require
submission to a jury or whether it is so one-sided that one party
must prevail as a matter of law."  <u>Id.</u> at 251-52.

IV.  <u>ANALYSIS OF PETITIONER'S CLAIMS</u>

A.  <u>The Conviction and Death Sentence are Void. (Claim 1)</u>

22

Petitioner contends that the Madison County Court lacked jurisdiction over his case because he never consented to a change of venue from Henderson County, Tennessee. (D.E. 15 at 48.) He claims that the trial court's lack of jurisdiction causes his conviction and death sentence to be void and makes imposition of the conviction and sentence a violation of his Sixth, Eighth and Fourteenth Amendment rights. (Id.)

Respondent asserts that this claim is procedurally defaulted because (1) Petitioner failed to present this claim on direct appeal or in his post-conviction proceeding, and there is no available procedure under Tennessee law to present the claim; and (2) Petitioner raised the issue in his state habeas proceeding on state law grounds only, not as a federal constitutional violation. (D.E. 90-1 at 5-6.) He argues that he repeatedly asserted his federal due process right to be tried only by a court that possesses jurisdiction in his appellate brief and cited two federal cases discussing standards used to determine whether an individual has waived a federal constitutional right. (D.E. 100 at 125-26.)

Petitioner's brief to the Tennessee Court of Criminal Appeals argued that the "judgment of guilty . . . was issued in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution" (D.E. 21, Add. 9, Vol. 2, p. 1), that Petitioner did not waive his constitutional right to a jury trial before an impartial jury in the county in which the crime was committed (id. at 8, 10), and

23

that it would violate due process for the right to be waived "absent his personal relinquishment" (id. at 8-9). The inmate relied on Estrada v. United States, 457 F.2d 255, 256 (7th Cir.), cert. denied, 409 U.S. 858 (1972), to address the waiver of a right to jury trial, and on Taylor v. Illinois, 484 U.S. 400 (1988), reh'g denied, 485 U.S. 983 (Mar. 28, 1988), a case dealing with the Sixth Amendment compulsory process clause, for the proposition that "certain constitutional rights, such as the right to a jury trial, are so essential to the concept of due process that no lawyer can waive them for a defendant." (D.E. 21, Add. 9, Vol. 2, p. 8.) The Court finds that Petitioner raised the federal constitutional issues of whether his due process and Sixth Amendment rights were violated by the trial court granting the change of venue and whether Petitioner made a knowing and voluntary waiver of his constitutional right to be tried before a jury in Henderson County. The Court concludes that these issues are not procedurally defaulted and must be reviewed on the merits.

On appeal from the denial of state court habeas relief, the Tennessee Court of Criminal Appeals held:

> As indicated, the petitioner asserts that he is entitled to habeas corpus relief because "he did not agree to a change of venue and the venue change was contrary to established law and procedure depriving the receiving court of jurisdiction." The record demonstrates that the petitioner filed two motions seeking a change of venue with the Henderson County trial court. The state apparently consented to the second of these motions and the trial court authorized the change to Madison County under Rule 21 of the Tennessee Rules of Criminal

24

> Procedure. While the petitioner now claims that his
> trial counsel did not have his permission to file the
> second motion, that is not a cognizable claim for habeas
> corpus relief. See Archer, 851 S.W.2d at 164. In our
> view, the petitioner has failed to establish that the
> Madison County trial court was without jurisdiction.
> Thus, the trial court did not err by dismissing the
> petition without a hearing.

Hall, 2006 WL 2000502, at *2.

A motion for change of venue was filed by Petitioner's counsel and denied at a hearing on November 8, 1995. (See D.E. 21, Add. 9, Vol.2, p. 5.) Petitioner's counsel argued that venue should be changed to "some county that has not been exposed to the newspaper articles, the television news items." (Id.) On September 12, 1996, the motion for change of venue was renewed (see id. at Add. 1, Vol. 1, p. 150), and Circuit Judge Whit LaFon granted the motion on September 16, 1996 (id. at Add. 1, Vol. 2, p. 152). Petitioner claims that Judge LaFon overruled his objection to the change of venue. (See id. at Add. 6, Vol. 1, p. 24.)

There was some testimony regarding the change of venue issue at the post-conviction hearing. The Tennessee Court of Criminal Appeals noted:

> Regarding the change of venue, Mr. Ford recalled reading
> newspaper articles and determining that a change of venue
> was "absolutely necessary." He said that this matter was
> discussed with the petitioner at length and that a motion
> was filed with the petitioner's permission. Mr. Ford
> stated that Judge LaFon granted the change without a
> hearing. Mr. Ford only became aware of the petitioner's
> dissatisfaction with the change of venue after the fact.

25

<u>Hall</u>, 2005 WL 22951, at *13.  Hall testified that he never asserted that he wanted to change the venue to Madison County.  <u>Id.</u> at *19.

Petitioner's claim arises under the vicinage right of the Sixth Amendment,[10] which provides "the right to a . . . jury of the . . . district wherein the crime shall have been committed, which district shall have been previously ascertained by law."  U.S. Const., amend. VI.  The Sixth Circuit has determined that the "districts" mentioned in the Sixth Amendment refer only to federal judicial districts and have never been defined to apply to states. <u>See</u> <u>Caudill v. Scott</u>, 857 F.2d 344, 345-46 (6th Cir. 1988);[11] <u>see also</u> <u>Cook v. Morrill</u>, 783 F.2d 593, 595 (5th Cir. 1986) (same).

_____

[10]Petitioner has not briefed this claim on the merits.  Respondent has only briefed this issue as it relates to his assertions of procedural default.  (<u>See</u> D.E. 90-1 at 5-6.)

[11]At the time of the Sixth Amendment's adoption, the Bill of Rights applied only to the federal government and therefore only to federal prosecutions.  Cf.  <u>Barron v. City of Baltimore</u>, 32 U.S. 243, 247 (1833). However, the Fourteenth Amendment Due Process Clause extended certain rights guaranteed by the Bill of Rights to protection against state action.  <u>Duncan v. Louisiana</u>, 391 U.S. 145, 147-48 (1968).  Only those rights that are "fundamental to the American scheme of justice" or "essential to a fair trial" were made applicable to the states.  <u>Id.</u> at 148-49.  The Supreme Court has not decided whether the Fourteenth Amendment incorporated the Sixth Amendment's vicinage right.  The only circuits to squarely address the issue have concluded that the Fourteenth Amendment did not extend federal vicinage protection to the states. <u>See</u> <u>Stevenson v. Lewis</u>, 384 F.3d 1069, 1071 (9th Cir. 2004), <u>cert. denied</u>, 543 U.S. 1191 (2005); <u>see also</u> <u>Bossett v. Walker</u>, 41 F.3d 825, 830 (2d Cir. 1994), <u>cert. denied</u>, 514 U.S. 1054 (1995) (expressing "considerable doubt" as to whether state venue issues raise a Sixth Amendment claim); <u>Cook v. Morrill</u>, 783 F.2d 593, 594-96 (5th Cir. 1986) (Though the United States Supreme Court has not yet decided whether the venue provision of the Sixth Amendment applies to the states, the Fifth Circuit has decided that it does not); <u>Zicarelli v. Dietz</u>, 633 F.2d 312, 320-26 (3d Cir. 1980) (providing a historical perspective about whether the vicinage right was one of the "fundamental principles of liberty and justice" that was incorporated into the Fourteenth Amendment's due process clause), <u>cert. denied</u>, 449 U.S. 1083 (1981); <u>Nuh Nhuoc Loi v. Scribner</u>, 671 F. Supp. 2d 1189, 1193-94 (S.D. Cal. 2009) (denying habeas relief because the Sixth Amendment's vicinage right has not been incorporated into the Fourteenth Amendment's due process clause).

Thus, Petitioner has no federal constitutional right to be tried in Henderson County.[12]

Hall is entitled to relief only if he can demonstrate that the trial court's change of venue denied him due process. <u>Cook</u>, 783 F.2d at 595-96; <u>see</u> <u>Simon v. Epps</u>, No. 2:04 CV26-P, 2007 WL 4292498, at *26 (N.D. Miss. 2007) (finding that moving the trial to a county forty miles from where the crime occurred did not violate petitioner's constitutional rights).

> [T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. A fair trial in a fair tribunal is a basic requirement of due process.

<u>Irvin v. Dowd</u>, 366 U.S. 717, 722 (1961) (citations omitted). A petitioner must show the actual existence of prejudice to prove he was denied the due process guarantee of a fundamentally fair trial. <u>Id.</u> at 723.

There is no evidence that the Madison County jury was so prejudiced against Petitioner as to invade a constitutionally protected right. <u>See</u> <u>Hack v. Elo</u>, 38 F.App'x 189, 196 (6th Cir. 2002) (petitioner was not entitled to a presumption of prejudice when he failed to demonstrate the "'actual existence' of partiality in some juror"). The Tennessee Court of Criminal Appeals'

---

[12]To the extent Petitioner had any right to be tried in Henderson County, once he filed a motion for a change of venue, he relinquished that right. <u>Nichols v. Bell</u>, 440 F. Supp. 2d 730, 825 (E.D. Tenn. 2006).

determination of the Sixth and Fourteenth Amendment issues is neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court and was based on a reasonable determination of the facts in light of the evidence presented.

Petitioner failed to address this issue as an Eighth Amendment claim in the state courts. He has not asserted cause and prejudice for his failure to exhaust an Eighth Amendment claim, nor has he demonstrated that a miscarriage of justice would result from the failure of this Court to consider this claim. Petitioner's claim of an Eighth Amendment violation is procedurally defaulted.

Claim 1 is DENIED.

B.    Lack of Standards Governing the Prosecution's Decision to Seek the Death Penalty (Claim 2)

Petitioner asserts that prosecuting agencies in Tennessee do not have or follow a statewide objective standard for determining when to seek the death penalty and that the Fourteenth Amendment's Equal Protection Clause precludes subjecting fundamental rights to differing, arbitrary standards throughout a state. (D.E. 15 at 48). He argues that the United States Supreme Court's ruling in Bush v. Gore, 531 U.S. 98 (2000), prevents counties from subjecting fundamental rights to differing, arbitrary standards -- what happens when local prosecutors make individual determinations of whether to seek the death penalty. (D.E. 100 at 145-48.)

Respondent contends that this claim has not been exhausted in the Tennessee courts and is procedurally defaulted. (D.E. 19 at 16; D.E. 90-1 at 6.) Respondent asserts that the claim is without merit because the Supreme Court in <u>Gregg v. Georgia</u>, 428 U.S. 153, 199 (1976) held that prosecutorial discretion in selecting candidates for the death penalty does not present a constitutional deprivation. (D.E. 90-1 at 6.)

Without making a determination of whether the claim has been procedurally defaulted, the Court finds that this issue is without merit. The Supreme Court has refused to strike down various death penalty statutes on the ground that those laws grant prosecutors discretion in determining whether to seek the death penalty. <u>See</u> <u>Proffitt v. Florida</u>, 428 U.S. 242, 254 (1976) (rejecting argument that arbitrariness is inherent in the Florida criminal justice system because it allows for discretion at each stage of a criminal proceeding); <u>Gregg</u>, 428 U.S. at 199 (petitioner's argument "that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense" does not indicate that the system is unconstitutional); <u>Campbell v.</u> <u>Kincheloe</u>, 829 F.2d 1453, 1465 (9th Cir. 1987), <u>cert. denied</u>, 488 U.S. 948 (1988) (Supreme Court has rejected argument that death penalty statute is unconstitutional because it vests unbridled discretion in prosecutor to decide when to seek the death penalty). The decision in <u>Bush</u>, a case involving the method of counting

29

ballots for a presidential election, does not require a different
result. See Chi v. Quarterman, 223 F.App'x 435, 439 (5th Cir.
2007), cert. denied, 551 U.S. 1193 (2007) (discussing the Bush
case's "utter lack of implication in the criminal procedure
context"); see also Wyatt v. Dretke, 165 F.App'x 335, 339-40 (5th
Cir. 2006), cert. denied sub nom. Wyatt v. Quarterman, 548 U.S. 932
(2006) (the Bush holding is "limited to the facts at issue there --
the 2000 presidential election"); Black v. Bell, 181 F. Supp. 2d
832, 879 (M.D. Tenn. 2001) (rejecting petitioner's due process and
equal protection claims that Bush establishes a new rule of law, to
be applied retroactively, which would require Tennessee prosecutors
to be guided by "hard and fast standards in determining whether to
seek the death penalty"). Petitioner's claim is without merit.

Claim 2 is DENIED.

C.   Incompetence to Stand Trial (Claim 3)

Hall asserts that he "believed that he could not testify on
his own behalf because a Flag of War" was placed in the courtroom
and that he "refused to testify on his own behalf because of his
belief that a Flag of War" was in the courtroom. (D.E. 15 at 49.)
Respondent contends that this claim was not exhausted in state
court and is procedurally defaulted. (D.E. 19 at 16-17; D.E. 90-1
at 7.)

On direct appeal, Petitioner raised the issue of whether the
trial court's refusal to remove a United States flag with gold

30

fringe from the courtroom denied him of his right to testify. <u>See Hall</u>, 8 S.W.3d at 596. The questions of Petitioner's competence to stand trial based on his beliefs about the flag and his refusal to testify were not addressed in the state courts. Petitioner has not exhausted this claim. He has not claimed cause and prejudice for his failure to exhaust this claim, nor has he demonstrated that a miscarriage of justice would result from the failure of this Court to consider this claim. Petitioner's claim is procedurally defaulted.

Claim 3 is DENIED.

D.    <u>Brady</u>[13] Claims (Claim 4)

Petitioner alleged that the state withheld evidence that (1) Chris Dutton had been convicted of providing law enforcement authorities false information; (2) the investigation into Billie Hall's homicide was characterized by misconduct including the creation of Michelle Hays Elliott, Latasha Whittington-Barrett, and Darlene Brittain's stories; and (3) certain testimony of Chris Dutton, Billie Hall's daughters Cynthia and Jennifer Lambert, and Dr. O. C. Smith was false. (D.E. 15 at 49-52.) Petitioner alleges that the prosecution withheld evidence and information which could have been used to impeach Dutton and prove that he was lying about his conversation with Hall, including evidence of Dutton's mental illness and that the witness sought and received favorable

---

[13]<u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963).

31

treatment for his work as an informant.  (D.E. 54 at 1-6.)
Petitioner asserts that the State withheld evidence and information
obtained from the Tennessee Bureau of Investigation ("TBI") which
would have impeached prosecution witnesses about the events at the
house on the night of the murder and established reasonable doubt
about whether the offense was premeditated, deliberate, first-
degree murder and/or worthy of the death penalty.  (Id. at 6-8.)

    Respondent contends that Petitioner's claims that the State
withheld material -- exculpatory evidence -- were not raised in the
Tennessee courts and are procedurally defaulted.  (D.E. 90-1 at 7-
8.)  Respondent also argues that Petitioner's Brady claims are
without merit.  (Id. at 8.)

    The inmate maintains that he can show cause and prejudice for
any procedural default of his Brady claims.  (D.E. 100 at 49.)
Relying on Apanovitch v. Houk, 466 F.3d 460 (6th Cir. 2006), he
insists that the withholding of evidence in violation of Brady
establishes a per se excuse or "cause" for the procedural default.
(D.E. 100 at 49-50.)  Petitioner asserts that prejudice is shown if
the withholding of the evidence "materially prejudiced" the
defense.  (Id.)  He also contends that he establishes prejudice
because his Brady claims have merit, and there is a reasonable
probability that at least one juror would have voted to acquit for
first degree murder and voted for life had this information been
disclosed.  (Id. at 52.)  Failure to review these claims, Hall

32

asserts, results in a miscarriage of justice. (<u>Id.</u> at 71.) The Court will address the merits of Petitioner's <u>Brady</u> claims because he relies on the merits of those claims to excuse the asserted procedural default.

The Supreme Court held in <u>Brady</u> "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." This duty to disclose "is applicable even though there has been no request by the accused . . . and . . . the duty encompasses impeachment evidence as well as exculpatory evidence." <u>Strickler v. Greene</u>, 527 U.S. 263, 280 (1999) (citations omitted). A <u>Brady</u> violation can also arise from the prosecution's knowing use at trial of perjured testimony. <u>Kyles v. Whitley</u>, 514 U.S. 419, 433 (1995) (citing <u>United States v. Agurs</u>, 427 U.S. 97, 103-04 (1976)); <u>accord</u> <u>Coe v. Bell</u>, 161 F.3d 320, 343 (6th Cir. 1998), <u>cert. denied</u>, 528 U.S. 842 (1999) ("'The burden is on the defendant[] to show that the testimony was actually perjured, and mere inconsistences in testimony by government witnesses do not establish knowing use of false testimony'") (quoting <u>United States v. Lochmondy</u>, 890 F.2d 817, 822 (6th Cir. 1989)).

A <u>Brady</u> violation has three components: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have

been suppressed by the State, either willfully or inadvertently;
and prejudice must have ensued." Strickler, 527 U.S. at 281-82.[14]
Evidence is "material" for Brady purposes if "there is a reasonable
probability that the suppressed evidence would have produced a
different verdict." Id. at 281; see also United States v. Bagley,
473 U.S. 667, 682 (1985) (adopting the Strickland formulation of
the Agurs test that "evidence is material only if there is a
reasonable probability that, had the evidence been disclosed to the
defense, the result of the proceeding would have been different").[15]

> [A] showing of materiality does not require demonstration
> by a preponderance that disclosure of the suppressed
> evidence would have resulted ultimately in the
> defendant's acquittal (whether based on the presence of
> reasonable doubt or acceptance of an explanation for the
> crime that does not inculpate the defendant. . . .
> Bagley's touchstone of materiality is a "reasonable
> probability" of a different result, and the adjective is
> important. The question is not whether the defendant
> would more likely than not have received a different
> verdict with the evidence, but whether in its absence he
> received a fair trial, understood as a trial resulting in
> a verdict worthy of confidence. A "reasonable
> probability" of a different result is accordingly shown
> when the government's evidentiary suppression "undermines
> confidence in the outcome of the trial."

Kyles, 514 U.S. at 434 (citations omitted). This standard is
similar to the "prejudice" component of an ineffective assistance
of counsel claim. See id. at 436; see also Bagley, 473 U.S. at 682

---

[14]The Supreme Court noted that, where a claim was not raised in state court
because of an allegation that the prosecutor suppressed evidence, a showing of
"cause and prejudice [for the procedural default] parallel two of the three
components of the alleged Brady violation itself." Strickler, 527 U.S. at 282.

[15]Materiality pertains to the issue of guilt or innocence, and not to the
defendant's ability to prepare for trial. Agurs, 427 U.S. at 112 n.20.

(noting that the reviewing court should consider any adverse effect the nondisclosure had on the preparation or presentation of the defendant's case).[16]  Moreover, materiality is to be evaluated "in terms of suppressed evidence considered collectively, not item by item." Kyles, 514 U.S. at 436 (footnote omitted).

    1.  Dutton

    Petitioner asserts that the prosecution withheld material exculpatory evidence showing that (1) Dutton testified falsely at trial when he claimed that Hall made damaging admissions to him, that Dutton didn't know what an informant was, that he was not an informant, that he did not testify to obtain benefits, and that he was only promised that the prosecution would speak at his parole hearing; (2) Dutton had been convicted of providing false information to law enforcement authorities; (3) Dutton had a history of mental illness; (4) he engaged in extensive work as an informant; (5) the witness received benefits for his testimony against Hall, including release from segregation and favorable transfers and treatment within the TDOC; and (6) Dutton expected favorable parole as consideration for his testimony against Petitioner. (D.E. 100 at 46, 48, 50.)  The inmate claims that the prosecution withheld evidence from Dutton's TDOC records that could have been used to impeach the witness by showing his long history

---

[16]The Court further explained that, unlike other types of trial error, a harmless error analysis is not appropriate.  Kyles, 514 U.S. at 435-36.

of mental illness, evidence of Dutton's work as an informant, and evidence of his receipt of benefits for his testimony against Petitioner.  (Id. at 50; see also D.E. 71 at 1-3.)

     a.   Dutton As An Informant

    Petitioner alleges that the prosecution withheld evidence that Dutton's testimony was false about the following:  (1) he did not hear from anyone, after writing his letter to the State, until District Attorney Jerry Woodall contacted him shortly before Hall's trial; (2) the only consideration provided Dutton for his testimony was Woodall's agreement to speak at Dutton's parole hearing; (3) at the time that Dutton testified, he had not received any benefit for agreeing to testify against Petitioner; (4) Dutton did not know what an informant was; and (5) favorable treatment had nothing to do with Dutton's decision to provide information to authorities and to testify against Petitioner.  (D.E. 15 at 49-51.)  Petitioner also argues that the prosecution withheld evidence of "a tacit or formal understanding" that Dutton would receive benefits for his testimony against Petitioner and of the favorable treatment that the witness, in fact, received in exchange for his testimony.  (D.E. 54 at 1, 4-6.)  The evidence that Petitioner contends should have been disclosed under Brady includes TDOC printouts of activities related to attempts to contact the Federal Bureau of Investigation ("FBI") and the North Carolina Attorney General (D.E. 102-19 at 2; D.E. 102-26), various TDOC records related to Dutton's

transfers, classifications, and program assignments (D.E. 102-20 through -22; D.E. 102-28 through -33), information related to Dutton's parole (D.E. 10-23), and other TDOC records which would provide background information regarding Dutton's convictions and state of depression at various points that might arguably demonstrate that he was motivated to seek a benefit by testifying as an informant (D.E. 102-24, 102-25, & 102-27). (D.E. 100 at 57-60.) Respondent contends that the TDOC records are not discoverable under <u>Brady</u> because they were not in the possession of the prosecutor or an agency involved in the investigation of Petitioner's case and are not material under <u>Brady</u>. (D.E. 90-1 at 9-11.)

The document which Petitioner contends demonstrates Dutton's efforts to contact the FBI to become an informant states, "Met w. Mr. Dutton in D Pod. He asked about FBI address, copies" on November 8, 1994. (D.E. 102-19 at 2.) Respondent argues that this document has no bearing on the case and that Petitioner's claim that it is exculpatory is based on "rank speculation." (D.E. 90-1 at 10.) Respondent notes that Dutton's request for the FBI address occurred several years prior to Dutton's testimony in Petitioner's case and that Petitioner has presented no evidence that the FBI was involved in this case or that Dutton acted as an informant for the FBI. (<u>Id.</u>) In rebuttal, Petitioner insists that this document demonstrates that Dutton knew what an informant was, that he

37

testified falsely at trial, and that he was motivated to lie against Petitioner to help law enforcement and the prosecution. (D.E. 100 at 68.) The Court finds that evidence that Dutton requested the FBI's address more than a year prior to Petitioner's confession to Dutton,[17] without any indication of why Dutton wanted the FBI's address, to be too tangential to require disclosure under Brady. For the same reason, the TDOC printout (D.E. 102-26) which states that on November 8, 1994, Dutton "wants address of of (sic) attorney gen (sic) office in N.C." is not material under Brady. Petitioner's Brady claims related to these two documents also fail because knowledge of the TDOC records cannot be imputed to the prosecution. See infra pp. 43-45.

With regard to Hall's Brady claims about TDOC records concerning Dutton's transfers, classifications, and program assignments, Petitioner alleges that Dutton started looking for an opportunity to provide information to law enforcement after being placed in administrative segregation at RMSI, the time period when he claims that he spoke to Petitioner about the details of the murder. (D.E. 54 at 5.) Petitioner claims that on November 2, 1995, though Dutton was still in administrative segregation, he was "hastily recommended for release and transfer to West Tennessee High Security Prison." (Id.) Petitioner infers that this

---

[17]At trial on February 4, 1997, Dutton testified that his conversation with Petitioner occurred "probably better than a year ago, going on a year" which would mean that the conversation occurred around February 1996. (See D.E. 21, Add.2, Vol. 2, p. 229.)

transfer, Dutton's release from administrative segregation on November 30, 1995, Dutton's transfer to medium custody at Fort Pillow Farm in March 1996, and his transfer to Cold Creek Correctional Facility -- a minimum security facility on March 28, 1996, all stemmed from his agreement to testify against Petitioner. (Id. at 5-6.)  In an attempt to show additional benefits received by Dutton in exchange for his testimony, Petitioner alleges that Dutton's release eligibility date was June 28, 1999, that Dutton testified against Petitioner in February 1997, that on August 14, 1998, Assistant District Attorney Earls wrote a letter to the Tennessee Board of Paroles on Dutton's behalf, and that Dutton was paroled on December 16, 1998.  (Id. at 6.)

Respondent argues that Petitioner's claim of Dutton being "hastily recommended for release and transfer" to the West Tennessee High Security Prison is contradicted by Dutton's prison records.  (D.E. 90-1 at 10.)  Respondent correctly notes that the TDOC records indicate that Dutton made his request for transfer around December 1995 because he was afraid of retaliation for his refusal to pass drugs in the unit; this request was made prior to his correspondence with the Attorney General and his meeting with the District Attorney.  (Id. at 11; see also D.E. 40-32 & 40-33.) Respondent notes that Dutton was not transferred until three to four months after his initial request.  (D.E. 90-1 at 11.) Further, the Court finds that Petitioner has not presented any

39

evidence of an agreement related to these transfers to demonstrate that Dutton negotiated these transfers in exchange for his testimony.

Respondent maintains that the evidence that the District Attorney General agreed to recommend parole if Dutton testified truthfully was not withheld. (Id.) At trial, Dutton testified

Q   In exchange for your truthful testimony, did I make any promises to you?

A   You told me as long as I testified truthfully that you would speak at my parole hearing when the time came.

Q   Is that the only promise you received from me?

A   Yes.

. . .

Q   Have you received any benefit at all at this point from providing that information to the authorities?

A   No, sir.

Q   Have you provided any information to any other law enforcement agency which has required your testimony?

A.   Yes, sir.

Q   And was that information -- When did you transmit that information?

A   In 1989. It would have been probably middle of 1990.

Q   So you helped the authorities once in 1989 or '90.

A   Yes, sir.

Q   And when you transmitted the information concerning the Defendant Jon Hall to the Attorney General's office in Nashville, did you also convey information involving any other area or state or individual?

40

A    Yes, sir.

Q    And what would that be?  Which state?

A    North Carolina.

Q    And as a result of that information provided to the
Attorney General in Nashville, have you testified in the
state of North Carolina?

A    Yes.

(D.E. 21, Add. 2, Vol. 2, pp. 230-32.)  On cross-examination,

Petitioner's attorney questioned Dutton regarding whether he was an

informant.

Q    Mr. Dutton, would it be a safe assumption that you
would be classified as an informant in the prison system?

A    I'm not sure of the definition of that, sir.

Q    Isn't that your role?

A    Excuse me?

Q    Isn't that your role with the authorities, to inform
them of certain things that you have heard?

A    No.

Q    In exchange for favorable treatment in the prison
system?

A    No, sir.

Q    That had nothing to do with your motivation, did it?

A    No.

(Id. at 232-33.)

Petitioner pieces together seemingly disconnected information

to contrive a theory that Dutton's transfers, classification and

assignments all resulted from his testimony against Petitioner.

41

Petitioner has not demonstrated that there was any agreement related to Dutton's parole or any benefit that was given to Dutton in exchange for his testimony other than that disclosed at trial.

Petitioner asserts that the prosecution withheld evidence that Dutton had been convicted of providing false information to law enforcement. (D.E. 15 at 49.) The jury was made aware that Dutton had been convicted in Bradley County of burglary, theft of property and burglary of an automobile, again in Bradley County of theft of property, and in Hamblin County of theft, aggravated assault and escape. (D.E. 21, Add. 2, Vol. 2, at 222-23.) Dutton also testified that he had spent fourteen or fifteen years of his life behind bars. (Id. at 223.)

In State v. Thompson, 420 S.E.2d 395, 399 (N.C. 1992), the opinion indicated that Dutton had previously been convicted of providing false testimony to law enforcement. The record in this habeas case contains no evidence of this fact. Petitioner has not demonstrated that the conviction for providing false information was known to the prosecution or was withheld.

Hall has not demonstrated that the information related to Dutton's transfers, classifications and program assignments, and the convictions for providing false information to law enforcement were required to be disclosed under Brady or that the failure to disclose this information prejudiced Petitioner. His argument regarding the benefits that Dutton received is speculative.

42

Further, the jury was aware that Dutton was a criminal, that he
sought parole in  exchange for his testimony, and that he testified
in other cases.  This information was sufficient to alert the jury
that Dutton's testimony may not be credible.  Petitioner's <u>Brady</u>
claims about benefits received by Dutton and his conviction for
providing false information are without merit.

> b.   <u>Dutton's Mental Health Issues</u>

Petitioner asserts that certain TDOC records which include a
letter, inmate intake forms, classification summaries, health
screenings, and other documents which establish Dutton's history of
mental illness were withheld, in violation of <u>Brady</u>, by the
prosecution.  (D.E. 100 at 56-57; <u>see also</u> D.E. 102-10 through -
18.)  Respondent asserts that the TDOC records related to Dutton's
mental health are not <u>Brady</u> material.  (D.E. 90-1 at 9.)
Respondent claims that the prosecutor did not have a duty to learn
about this evidence, that the TDOC records were not in the
possession of an agency or actor acting on the State's behalf, that
TDOC was not involved in the investigation of Petitioner's case,
and that the knowledge of these records should not be imputed to
the State.  (<u>Id.</u> at 9-10.)

Hall has not presented any evidence that the prosecution had
knowledge of Dutton's mental health issues.  Instead, he attempts
to impose a duty on the prosecutor to obtain and review the TDOC
records because Dutton is a criminal witness.  (<u>See</u> D.E. 100 at

66.) Petitioner argues, based on <u>Carriger v. Stewart</u>, 132 F.3d 463 (9th Cir. 1997), <u>cert. denied</u>, 523 U.S. 1133 (1998) that

> when the state decides to rely on the testimony of such a witness, it is the state's obligation to turn over all information bearing on that witness's credibility. This must include the witness's criminal record, *including prison records, and any information therein which bears on credibility.*

<u>Carriger</u>, 132 F.3d at 480 (emphasis added). <u>Carriger</u> differs from the instant case because the only direct evidence of Carriger's guilt was the testimony of an informant who had been granted immunity in exchange for his testimony, admitted on several occasions and once under oath that he was the one who committed the robbery and murder, was well known by state authorities to be a liar, and had a pattern of lying to police and shifting blame to others. <u>Id.</u> at 470-71, 480. <u>Carriger</u> involved a situation where the evidence, especially the informant's confessions, was more likely to undermine the court's confidence in the outcome of the trial than Hall's case.

Petitioner cites other cases from the Third, Fifth and Ninth Circuits that he contends supports [sic] his proposition. (<u>See</u> D.E. 100 at 66-67.) Notably, no Sixth Circuit cases were mentioned. In <u>Benge v. Johnson</u>, 474 F.3d 236 (6th Cir.), <u>cert. denied</u>, 552 U.S. 1028 (2007), the Sixth Circuit emphasized that "<u>Brady</u> requires the government to 'turn over evidence *in its possession* that is both favorable to the accused and material to guilt or punishment,' including evidence that could be used to

44

impeach the credibility of a government witness." <u>Benge</u>, 474 F.3d at 243 (internal citation omitted) (emphasis added). An individual prosecutor is presumed to have knowledge of the information gathered in connection with his office's investigation of the case and indeed "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." <u>Kyles</u>, 514 U.S. at 437; <u>see</u> <u>United States v. Payne</u>, 63 F.3d 1200, 1208 (2d Cir. 1995), <u>cert. denied</u>, 516 U.S. 1165 (1996) (Under <u>Brady</u> and its progeny, the government has an affirmative duty to disclose favorable evidence known to it and is presumed to have knowledge of all information gathered in connection with the government's investigation). An unlimited duty to inquire of other government offices with potentially exculpatory information is not imposed on a prosecutor. <u>United States v. Gambino</u>, 835 F. Supp. 74, 95 (E.D.N.Y. 1993), <u>aff'd</u>, 59 F.3d 353 (2d Cir. 1995). This Court has found no Sixth Circuit precedent which imposes the duty that Petitioner attempts to apply in this case.

Petitioner's argument fails because knowledge of information in the possession of one government entity is not automatically imputed to the prosecution. <u>Garcia v. McDonough</u>, No. 07-20843-CIV, 2008 WL 954278, at **24-25 (S.D. Fla. Apr. 8, 2008). An analysis of the connection between the pertinent agencies is required. <u>United States v. Antone</u>, 603 F.2d 566, 569-70 (5th Cir. 1979). In

this case, Petitioner does not allege there was any connection between the TDOC and the prosecution in the investigation of this case, and none is apparent from the record.  <u>See</u> <u>United States v. Phibbs</u>, 999 F.2d 1053, 1088 (6th Cir. 1993), <u>cert. denied</u>, 510 U.S. 1119 (1994) (prison records were never in the prosecution's control, and the government was not otherwise aware of any exculpatory information within these records).  As there is no basis for imputing knowledge of the mental health information in Dutton's TDOC records to the prosecution, this <u>Brady</u> claim lacks merit.

2.  Testimony of Lambert Girls

Hall alleges that the State withheld evidence that Jennifer and Cynthia Lambert testified falsely about Petitioner pushing his way into the house, his blocking access to the bedroom, that Petitioner did not take care of the children, that he said he would kill Billie if the children called the police, and that he told Billie she would not live to graduate.  (D.E. 15 at 49-51.) Petitioner contends that the TBI handwritten notes indicate that Jennifer told the TBI that Billie let Petitioner in the house, that he said he did not want to fight, that Petitioner drank two or three beers in the house, and that he did not immediately attack Billie but struck her after about an hour long discussion.  (D.E. 54 at 7; D.E. 100 at 32.)  Petitioner also asserts that the TBI notes reveal that he entered the house with a bag of beer.  (D.E. 54 at 7.)

The only discrepancies between the testimony, the TBI statements, and the TBI notes deal with whether Petitioner pushed his way into the home and how much time passed between his arriving at the home and the altercation between Petitioner and Billie.  At trial, Jennifer was simply asked to tell what happened that night. (D.E. 21, Add. 2, Vol. 2, pp. 276-77.)  Her testimony did not reveal the amount of time from Petitioner's entry into the home until the altercation began with Billie.  (See id. at 277-82.)  She

47

also does not say anything about whether Billie let Petitioner in the house or whether he forced his way in.  (Id.)

Cynthia initially testified that Petitioner pushed his way in the house (D.E. 21, Add. 2, Vol. 2, p. 260), but she admitted on cross-examination that she did not remember whether he forced his way in.  (Id. at 269-70.)  Cynthia also related that Petitioner and Billie did not fight when he first got to the house and that Petitioner brought some beer and drank it.  (Id. at 269.) Petitioner's counsel did not ask about how much time passed between his client's arrival and the altercation.

The amount of time that passed after Petitioner's arrival was addressed in the TBI statements.  Cynthia indicated that "after a while" the girls went to bed and Petitioner and Billie began to fight.  (D.E. 102-9.)  The details from the TBI notes regarding Jennifer's statement that Petitioner stayed about an hour and he drank two or three beers (see D.E. 103-1) were not included in the typewritten TBI statement.  However, evidence that Petitioner was drinking and that time lapsed from his arrival was presented at trial.  Therefore, Petitioner was not prejudiced by the state's failure to disclose the TBI notes.

Additionally, this is not information about which Petitioner can claim that he had no knowledge.  Hall was present for these events and able to either advise his counsel of the discrepancies in information or testify himself.  There is no Brady violation if

48

the defendant "knew or should have known the essential facts
permitting him to take advantage of any exculpatory information or
where the evidence is available to defendant from another source."
United States v. Clark, 928 F.2d 733, 738 (6th Cir.), cert. denied,
502 U.S. 846 (1991) & 502 U.S. 885 (1991) (internal citations and
quotation marks omitted). The Court finds that the omission from
the TBI notes was not "of sufficient significance to result in the
denial of defendant's right to a fair trial." Spirko v. Mitchell,
368 F.3d 603, 610 (6th Cir. 2004), cert. denied, 544 U.S. 948
(2005) (internal citations and quotation marks omitted).

### 3. Crime Scene Diagram

Petitioner alleged that the prosecution withheld evidence of
a crime scene diagram identifying a sack of beer found in the
house. (D.E. 54 at 8.) He references in his reply the crime scene
diagram which was purportedly withheld, indicating that it was made
available through the TBI file (D.E. 71 at 2), but he has not put
the crime scene diagram in the record.

Respondent asserts that Petitioner has not established that
this document was withheld. (D.E. 90-1 at 13.) Respondent notes
that even if the diagram was withheld, Petitioner was not
prejudiced by this information because Cynthia testified about
Petitioner bringing beer to the house on the day of the murder.
(Id.; see D.E. 21, Add. 2., Vol. 2, p. 270.) Petitioner has not
established that he was prejudiced by the failure to disclose the

49

crime scene diagram which indicated that there were beer bottles in the house, as there was evidence on the record that he had been drinking beer at the house.

Hall does not assert an excuse other than the miscarriage of justice for the procedural default of his <u>Brady</u> claims related to the stories of Michelle Hays Elliott, Latasha Whittington-Barrett and Darlene Brittain. (D.E. 100 at 42.) Petitioner has not established that the Court's failure to review these claims will result in a miscarriage of justice. These claims are procedurally defaulted.

The Court finds that none of Petitioner's asserted <u>Brady</u> violations are deserving of habeas relief, and that Petitioner was not denied a fair trial.[18] Claim 4 is DENIED.

E.    <u>False Testimony and Evidence (Claim 5)</u>

Petitioner alleges that the prosecution presented the perjured testimony of Dutton, Cynthia and Jennifer Lambert, and O.C. Smith, that the State used photographs that misrepresented the crime scene, and that the State relied on this false evidence in closing arguments. (D.E. 15 at 50-52.) Respondent contends that these claims have not been raised in any Tennessee courts and are

---

[18]Hall, relying on <u>Cone v. Bell</u>, 129 S. Ct. 1769 (2009), asserts that the Court should consider the cumulative effect of the alleged <u>Brady</u> violations to determine whether he received a fair trial. In <u>Cone</u>, the case was remanded because the lower court did not thoroughly review the suppressed evidence or consider the cumulative effect of the evidence on the jury. <u>Cone</u>, 129 S. Ct. at 1784, 1786. The instant case differs from <u>Cone</u> because a review of the allegedly suppressed evidence, even considered collectively, does not establish a <u>Brady</u> violation.

procedurally defaulted and also that the Petitioner has not met his burden in pleading these claims.  (D.E. 90-1 at 13.)

Petitioner does not dispute that his false testimony claims were not exhausted in state court.  He claims that Respondent's procedural default argument fails because the State has no legitimate interest in presenting false testimony, there is cause and prejudice because the prosecution misled Petitioner with false evidence and withheld proof that the evidence was false, and Petitioner has established a fundamental miscarriage of justice because he is actually innocent of first-degree murder.  (D.E. 100 at 35-36.)  Petitioner relies on Banks v. Dretke, 540 U.S. 668 (2004) to argue that he has established "ample cause" for the procedural default of his false testimony and false evidence claims.  (D.E. 100 at 41.)

The Sixth Circuit in Henley v. Bell, 487 F.3d 379, 388 (6th Cir. 2007), cert. denied, 128 S. Ct. 2962 (2008) forecloses the argument based on Banks that a defendant has "little responsibility to inquire into the facts" of his Brady and false evidence claims. A defendant must still show good cause based on "events or circumstances 'external to the defense'" and resulting prejudice to excuse the failure to exhaust a claim.  Henley, 487 F.3d at 388 (quoting Banks, 520 U.S. at 696).

Petitioner's related Brady claims do not establish cause for the procedural default of these false evidence claims because the

Court has determined that these <u>Brady</u> claims are not entitled to habeas relief.  <u>See</u> <u>supra</u> p. 49.  Petitioner has not demonstrated cause and prejudice for the failure to exhaust these claims or that a miscarriage of justice would result from the Court's failure to review these claims.  His false evidence and false testimony claims are procedurally defaulted.

Claim 5 is DENIED.

F.  <u>Right to Testify (Claim 6)</u>

Hall asserts violations of his Sixth, Eighth and Fourteenth Amendment rights because the trial court did not obtain a knowing and voluntary waiver of his right to testify.  (D.E. 15 at 52.)  He claims that he believed he could not testify on his own behalf because a "Flag of War"[19] was present in the Madison County courtroom and that he informed Judge LaFon he was not going to

---

[19]The Tennessee Supreme Court stated,

the defendant apparently perceived gold fringe ornamentation on the courtroom flag to be symbolic of martial law jurisdiction.  We note that the display of the United States flag with gold fringe is common in many ceremonial settings, including courtrooms.  From a historical and legal standpoint, the use of fringe on the flag has no inherent or established symbolism.  It has nothing to do with the jurisdiction of the court or with martial law.  It is purely a decorative addition to enhance the appearance of the flag.

<u>Hall</u>, 8 S.W.3d at 604 n.6; <u>see</u> <u>Bricker v. Superintendent of Sci-Mercer</u>, No. 1:CV-09-01552, 2009 WL 3241682, at *2 n.2 (M.D. Pa. Oct. 2, 2009)(explaining the petitioner's belief that the "state courtrooms are under military occupation . . . because the courtrooms do not fly 'the American flag of peace of the (u)nited States of America . . . .', and instead fly 'gold-fringed military flag of war' . . . ."); <u>see also</u> <u>State v. Foss</u>, No. 03-S-426, 2003 WL 23145493, at *3 (N.H. Super. Oct. 23, 2003) (rejecting claim that the court is a military court because of fringe on the flag).

52

testify for that reason. (Id.) Petitioner alleged that Judge
LaFon refused to remove the flag. (Id.)

Respondent acknowledges that on appeal to the Tennessee
Supreme Court, Petitioner raised the issue that the "flag of war"
prevented him from exercising his right to testify in violation of
his Fifth, Sixth and Fourteenth Amendment rights.[20] (D.E. 90-1 at
14.) However, Respondent contends that Petitioner never raised the
claim of a violation of his Eighth Amendment rights by the presence
of the United States flag with the gold fringe. (Id.)

The inmate contends that his Eighth Amendment claim is not
procedurally defaulted because, based on Woodson v. North Carolina,
428 U.S. 280, 305 (1976), he "necessarily invoked" the Eighth
Amendment by asserting that the trial court denied him due process.
(D.E. 100 at 126-27.) Petitioner's Eighth Amendment claim has not
been fairly presented to the state court and is procedurally
defaulted. See Hodges v. Bell, 548 F. Supp. 2d 485, 560 (M.D.
Tenn. 2008) ("For those claims for which Petitioner now relies upon
constitutional amendments that were not cited and briefed in the
state courts, the Court concludes that those claims were not fairly
presented to the state courts and will be considered as unexhausted
and defaulted"). Woodson does not stand for the proposition that
any denial of due process in a capital case automatically invokes
the Eighth Amendment. As to Petitioner's implicit review theory,

---

[20]Petitioner does not assert a violation of his Fifth Amendment rights in
his habeas petition.

in <u>Webb v. Mitchell</u>, 586 F.3d 383 (6th Cir. 2009), the Sixth
Circuit noted that it had accepted an implicit review theory
previously in <u>Cone v. Bell</u>, 359 F.3d 785, 790-94 (6th Cir. 2004),
<u>rev'd</u>, 543 U.S. 447 (2005) but that holding was limited to Eighth
Amendment vagueness challenges. <u>See</u> <u>Webb</u>, 586 F.3d at 400. The
Court declines to extend that theory to excuse the procedural
default of Petitioner's Eighth Amendment claim that he did not
receive a knowing and voluntary waiver of his right to testify.

Petitioner argues that the Tennessee Supreme Court, pursuant
to Tennessee Code Annotated § 39-2-205(c)(repealed), considered his
Eighth Amendment claim on direct appeal because the claim raised
the possibility that Petitioner's death sentence was arbitrary.
(D.E. 100 at 129.) In <u>Coe</u>, the Sixth Circuit indicated that the
proposition that a claim has been exhausted because § 39-2-205
requires the supreme court to review significant errors is "too
broad, as it would eliminate the entire doctrine of procedural bar
in Tennessee in capital cases." <u>Coe</u>, 161 F.3d at 336. Similarly,
the Court finds that Petitioner's contention that the claim is not
procedurally defaulted because the Tennessee Supreme Court reviewed
the claim pursuant to Rule 52 of the Tennessee Rules of Appellate
Procedure for fundamental error is without merit. (<u>See</u> D.E. 100 at
131-32.)

Petitioner asserts that ineffective assistance of appellate
counsel establishes cause and prejudice for the failure to exhaust

his Eighth Amendment claim because it is an "arguably meritorious"
claim which should have been presented on appeal. (<u>Id.</u> at 135-37.)
He did not raise a claim of ineffective assistance of appellate
counsel in the state court. Petitioner has not demonstrated cause
and prejudice for the failure to exhaust his ineffective assistance
claims. As a result, these claims are procedurally defaulted and
do not establish cause for the failure to exhaust Petitioner's
right to testify claims. <u>See</u> <u>Edwards v. Carpenter</u>, 529 U.S. 446,
451-52 (2000) ("'[A] claim of ineffective assistance,' . . .
generally must 'be presented to the state courts as an independent
claim before it may be used to establish cause for a procedural
default.'") (quoting <u>Murray</u>, 477 U.S. at 489).

On direct appeal, the Tennessee Supreme Court held:

At the conclusion of proof in both the guilt phase and
the penalty phase, the trial court sought to have the
defendant take the stand to confirm that he knowingly and
intelligently decided not to testify at trial after
consultation with his attorneys. On both occasions, the
defendant refused to be sworn to testify unless the trial
court removed "the flag of war," i.e., the United States
flag, from the courtroom. The trial court refused to
remove the flag and proceeded to inquire of defense
counsel whether counsel had explained the defendant's
right to testify and whether the defendant had knowingly
and voluntarily waived this right. Counsel indicated
that they fully explained to the defendant the
complementary rights to testify in one's own defense and
to be free from self-incrimination, after which he chose
not to testify.

The defendant now asserts that the trial court's refusal
to remove the flag infringed on his right to testify in
his own defense. We note that the defendant did not file
any motion during either the guilt or sentencing phase
expressly requesting removal of the flag so that he could

exercise his right to testify.  This issue was not raised
in either the Motion for New Trial or in the Court of
Criminal Appeals.  Technically, the issue has been
waived.  Tenn. R. App. P. 3(e), 36(a).  In any event, a
trial court's refusal to remove the United States flag
from the courtroom does not violate anyone's
constitutional rights.  This issue is wholly without
merit.

Hall, 8 S.W.3d at 603-04 (footnote omitted).

   The Tennessee Supreme Court's decision that the issue had been

waived would normally constitute an adequate and independent state

law ground which bars habeas relief.  See Hutchison v. Bell, 303

F.3d 720, 738 (6th Cir. 2002) ("This Court has previously

determined that Tennessee's waiver rule, Tennessee Code Annotated

§ 40-30-206(g), which provides that claims not raised in a prior

proceeding are barred, constitutes an adequate and independent

state-law rule precluding habeas relief.").  Since the Tennessee

Supreme Court also addressed this issue on the merits, the Court

will consider whether Petitioner's fundamental right to testify was

violated.

   The right of a defendant to testify at trial is a fundamental

constitutional right and is subject only to a knowing and voluntary

waiver by the defendant; it is a right essential to the due process

of law under the Fifth and Fourteenth Amendments.  Rock v.

Arkansas, 483 U.S. 44, 51-52, 53 n.10 (1987).  "The right may, in

appropriate cases, bow to accommodate other legitimate interests in

the criminal trial process.  But restrictions of a defendant's

right to testify may not be arbitrary or disproportionate to the

purposes they are designed to serve." <u>Id.</u> at 55-56 (internal citations and quotation marks omitted).

A defendant's rights under the Constitution may be waived, provided that waiver is voluntary, knowing and intelligent. <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938). The trial court generally has no duty to ask whether the waiver is voluntary. <u>United States v. Davis</u>, 332 F.App'x 247, 249 (6th Cir. 2009); <u>United States v. Campbell</u>, 86 F.App'x 149, 153 (6th Cir. 2004). A defendant is presumed to have waived his right to testify unless the record contains evidence indicating otherwise. <u>Hodge v. Haeberlin</u>, 579 F.3d 627, 639 (6th Cir. 2009); <u>United States v. Webber</u>, 208 F.3d 545, 551 (6th Cir.), <u>cert. denied</u>, 531 U.S. 882 (2000).

The record reveals the colloquy at trial about Petitioner's concern with testifying with a "flag of war" in the courtroom.

> THE COURT: Mr. Hall, would you please stand? Would you stand and raise your right hand?
>
> THE DEFENDANT: Are you trying to coerce me inside the bar –- the sanctuary of the bar? See, you didn't remove that flag of war.
>
> THE COURT: Mr. Hall, I order you to raise your right hand. You refuse?
>
> THE DEFENDANT: Your Honor, they're trying to take my life away. I have my constitutional rights. What do I have to be sworn in for? You know who I am.
>
> . . .

57

MR. WOODALL:    Your Honor, I think it needs to be on the record it's his decision not to testify on his own behalf.

THE COURT:    Well, Mr. Ford, have you told this man the possibility about testifying and not testifying?

MR. FORD:    We fully discussed that, Your Honor, and of course, we rested our case.

THE COURT:    And then what did he tell you? What was his -- Did he agree, or did he tell you that he agreed not to take the stand?

MR. FORD:    Well, Your Honor, that may be privileged communication and a decision that we may have arrived at discussing strategies of the case. I don't know if I'm allowed to --

THE COURT:    Well you go ahead. Listen to this. Did you discuss it with him?

MR. FORD:    Yes, sir.

THE COURT:    And then after the discussion, was he advised with regard to what the decision was going to be as to whether he would testify or not?

MR. FORD:    Yes, sir.

THE COURT:    In your opinion was that made freely?

MR. FORD:    Yes, sir, after -- We've discussed that issue numerous -- on numerous occasions.

THE COURT:    Anything else, General?

MR. WOODALL:    No, sir, that's fine.

THE COURT:    Call the jury back.

THE DEFENDANT: Your Honor, I'll testify if you take down the flag of war or sign that judicial contract.

THE COURT:    I don't know what -- Do you mind advising your client I'm not aware of a --

THE DEFENDANT: I sent it to you and you signed it certified receipt.

THE COURT:    Call the jury back.  The case is already closed.

(D.E. 21, Add. 2., Vol, 3, pp. 346-49.)

The record reveals that Petitioner discussed the issue of testifying at trial with his counsel, was advised by his counsel, and refused to testify.  See Hall, 2005 WL 22951, at *13.  The evidence does not reflect that Petitioner's waiver of his right to testify was invalid.  The trial court did not restrict Petitioner's right to testify.  He attempted to place a condition on the court about the circumstances under which he was willing to testify.  The Tennessee Supreme Court's determination of this issue is neither contrary to, nor an unreasonable application of clearly established federal law as decided by the United States Supreme Court and was based on a reasonable finding of the facts in light of the evidence presented.

Claim 6 is DENIED.

G.    Improper Extraneous Influences on the Jury (Claim 7)

Hall alleges that in violation of his Sixth, Eighth and Fourteenth Amendment rights, the jury was subjected to the following improper extraneous influences:

(1) the family members of Billie Hall sat among prospective jurors during jury selection, resulting in a prospective juror hugging one of Billie Hall's family members;

59

(2) prospective jurors were repeatedly told during voir dire that should they find Hall guilty of first-degree murder, he had to receive a death sentence;

(3) Judge LaFon told prospective jurors that the jury's verdict would be advisory;

(4) prospective jurors were told during voir dire that Hall's children will testify and the jury should presume that their testimony is truthful;

(5) a co-worker of Billie Hall's gave hugs to fellow jurors;

(6) Billie Hall's family member(s) embraced a juror during a break in trial;

(7) Billie Hall's mother started wailing during the State's closing argument at the guilt stage and was removed from the courtroom, but her cries were still heard while the State continued the closing argument;

(8) The jury saw Petitioner in shackles; and

(9) the State presented excessive autopsy photographs (in number, size, and subject-matter) causing one juror to become physically ill.

(D.E. 15 at 52-53.)  Respondent argues that all of these claims[21] are procedurally defaulted for failure to exhaust them in the Tennessee courts.  (D.E. 90-1 at 17.)

Hall does not address Respondent's contentions that sub-claims 1, 5, 6 and 8 are procedurally defaulted.  Petitioner did not raise these issue before the Tennessee courts.  He has not demonstrated cause and prejudice for the procedural default of these claims or

---

[21]With regard to Petitioner's claim related to the autopsy photographs, Respondent admits that he challenged the introduction of autopsy photographs before the Tennessee Supreme Court.  (D.E. 90-1 at 17.)  However, Petitioner did not challenge the autopsy photographs as being excessive or assert that their admission violated a federal constitutional right.  (Id.)  Petitioner objected to the autopsy photographs based on state evidentiary principles.  (Id.)  Therefore, Respondent contends that this claim is also procedurally defaulted.

that the Court's failure to review them would result in a miscarriage of justice. Sub-claims 1, 5, 6 and 8 are procedurally defaulted.

Petitioner contends that sub-claims 2, 3, 4, 7 and 9 were considered by the Tennessee Supreme Court on direct appeal, pursuant to § 39-23-205(c) (repealed), for a determination of whether the sentence was arbitrary, and whether there was fundamental error based on Rule 52. (D.E. 100 at 129-32, 136.) For the reasons stated, _supra_ p. 53, the Court declines to consider Petitioner's implicit review theories.

The inmate also avers that Tennessee Code Annotated § 39-13-204(c) disabled the rules of evidence leaving the Tennessee Supreme Court with only a constitutional basis for addressing Petitioner's claim. (D.E. 100 at 130-31.) The Court finds Petitioner's argument that the Tennessee Supreme Court necessarily reviewed this issue on constitutional grounds because of § 39-13-204(c) without merit.

The Court finds that Petitioner's constitutional claims related to the effect of the autopsy photographs on the jury were not exhausted in the state court. He has not demonstrated cause and prejudice for the failure to exhaust sub-claims 2, 3, 4 and 7 or that the Court's failure to review these claims would result in

a miscarriage of justice.[22]    Sub-claims 2, 3, 4 and 7 are procedurally defaulted.

Petitioner argues that he fairly presented his habeas claim related to the autopsy photographs (sub-claim 9) to the Tennessee Supreme Court in his direct appeal brief by referencing three times the specific number of such photographs admitted and by labeling the introduction of these photographs as "cumulative." (D.E. 100 at 127.)  He defined the issue in his brief as, "Did the trial court improperly admit gruesome autopsy photographs, which were needlessly cumulative, and served no purpose other than to inflame and impassion the jury?" (D.E. 21, Add. 4. Vol. 1, at 1.)  Despite Petitioner's reference to the autopsy photographs as "needlessly cumulative," he did not assert a violation of a federal constitutional right in his brief, nor did the Tennessee Supreme Court address such a violation in its opinion.  See Hall, 8 S.W.3d at 601-02 (footnote omitted).[23]    Sub-claim 9 is procedurally defaulted as Petitioner has not presented an excuse for his failure to exhaust this claim.

Claim 7 is DENIED.

H.    False Evidence (Claim 8)

_____

[22]Petitioner's allegation that ineffective assistance of appellate counsel establishes cause (see D.E. 100 at 135-36) for the failure to exhaust fails because he has not independently exhausted any ineffective assistance of appellate counsel claims.  See supra pp. 53-54.

[23]The Tennessee Supreme Court noted that the Court of Criminal Appeals applied Rules 401 and 403 of the Tennessee Rules of Evidence and weighed the probative value of the photographs against their prejudicial effect on the defendant's case.  Hall, 8 S.W.3d at 602 n.5.

62

Petitioner reargues his assertions in Claim 5 related to false evidence in the instant claim. This claim is procedurally defaulted for the same reasons stated for Claim 5. See supra pp. 49-51.

I. Unconstitutional Jury Instructions (Claims 9 & 10)

Hall alleges that the trial court's jury instructions at the guilt phase on reasonable doubt, intent, and intoxication, and that the instructions at sentencing on the heinous, atrocious and cruel aggravating circumstance, on unanimity, and that the jury should consider only aggravating circumstances were unconstitutional. (D.E. 15 at 54.)

a. Guilt Phase Instructions

Respondent contends that Petitioner's claims relating to the errors in the jury instructions given at the guilt phase are procedurally defaulted for failure to raise them in any state court. (D.E. 90-1 at 20.) Petitioner does not dispute that his claims regarding the guilt phase instructions for reasonable doubt and intent are procedurally defaulted. He did not raise these claims in the Tennessee state courts. Petitioner has not demonstrated cause and prejudice for the procedural default of these claims or that the Court's failure to address these issues would result in a miscarriage of justice. Petitioner's claims related to the jury instructions for reasonable doubt and intent are also procedurally defaulted.

63

The intoxication instruction was raised as an issue during
oral argument on direct appeal, and Petitioner asserts that the
claim is not procedurally defaulted. (D.E. 100 at 5.)[24] The
Tennessee Supreme Court found that the issue was waived for failure
to raise it in a motion for new trial. The Tennessee Supreme Court
stated:

> During oral argument, the defendant raised . . . for the
> first time: . . . whether the trial court erred during
> the guilt phase by instructing the jury, in reference to
> the intoxication defense, that "[i]ntoxication is
> irrelevant [sic] to the issue of the essential element of
> the Defendant's culpable mental state." Neither the use
> of the mannequin nor the misstatement of the pattern jury
> instruction were objected to at trial. Moreover, they
> were not listed as errors in either the Motion for New
> Trial or in the appeal to the Court of Criminal Appeals.
> We find that the failure to raise these issues in
> previous proceedings constitutes waiver, and we decline
> to address them at this time. Tenn. R. App. P. 3(e);
> Tenn. R. App. P. 36(a).

Hall, 8 S.W.3d at 596 n.1.

The Sixth Circuit has held that "Tennessee's waiver rule,
[Tennessee Code Annotated] § 40-30-206(g), which provides that
claims not raised in a prior proceeding are barred, constitutes an
adequate and independent state-law rule precluding habeas relief."

---

[24]In a petition for declaratory judgment filed in the Chancery Court of
Davidson County, Tennessee, Petitioner argued that certain corrections officers
removed his attorney's phone number from his calling list depriving him of his
constitutional rights. Hall v. McLesky, 83 S.W.3d 752, 754 (Tenn. 2001), perm.
app. denied (Tenn. July 8, 2002). In a petition for rehearing, he asserted that
if his attorney had timely briefed the question of the erroneous intoxication
jury instruction, the Tennessee Supreme Court would have been compelled to reduce
his conviction from first degree to second degree murder or to order a new trial.
Id. at 759-60. The Tennessee Court of Appeals disagreed based on the Supreme
Court's review of the evidence surrounding Petitioner's claim of diminished
capacity. Id. at 760-61. The Tennessee Court of Appeals determined that this
claim was subject to a harmless error standard, and that the erroneous jury
instruction would not have led to a different result. Id.

<u>Hutchison v. Bell</u>, 303 F.3d 720, 738 (6th Cir. 2002); <u>Cone v. Bell</u>, 243 F.3d 961, 969 (6th Cir. 2001), <u>rev'd on other grounds</u>, 535 U.S. 685 (2002).    Hall  contends  that  the  waiver  rule  is  not  an "adequate"  state  law  ground  because  this  is  a  capital  case  and Petitioner  had  the  right  to  raise  this  issue  on  direct  appeal. (D.E. 100 at 6.)    He argues that, in <u>State v. Rimmer</u>, 250 S.W.3d 12,  32  (Tenn.  2008),  <u>cert. denied</u>,  129  S.  Ct.  111  (2008),  the Tennessee  Supreme  Court  recognized  a  capital  case  exception  to  the rule  that  an  issue  is  waived  if  not  raised  in  a  motion  for  new trial.    Petitioner  also  insists  that  the  rule  of  waiver  is  not "strictly  and  regularly"  applied.    (D.E. 100 at 11.)    The  Court declines  to  make  a  determination  that  this  claim  is  procedurally defaulted and will address this issue on the merits.

The  jury  instruction  about  intoxication  stated,

> Intoxication  itself  is  generally  not  a  defense  to prosecution  for  an  offense.    If  a  person  voluntarily becomes  intoxicated  and  while  in  that  condition  commits an  act  which  would  be  a  crime  if  he  or  she  were  sober, he  or  she  is  fully  responsible  by  his  or  her  conduct.    It  is the  duty  of  person  to  remain  (sic)  from  placing themselves  in  a  condition  which  poses  a  danger  to  others.

> Intoxication  means  disturbance  of  mental  or  physical capacity  resulting  from  introduction  of  any  substance  in the body.

> Voluntary  intoxication  means  intoxication  caused  by a  substance  that  the  person  knowingly  introduced  into  the person's  body,  the  tendency  of  which  to  cause intoxication  was  known  or  ought  to  have  been  known.

> Intoxication  is  *irrelevant*  to  the  issue  of  the essential   element  of  the  Defendant's  culpable  mental state.

(D.E. 21, Add. 2, Vol. 3, p. 367) (emphasis added).  Petitioner
argues, quoting <u>Wiley v. State</u>, 183 S.W.3d 317, 333 (Tenn. 2006),
that "[e]vidence of a defendant's intoxication is relevant to
negate a culpable mental state of a charged offense." (D.E. 100 at
14-15.)  He claims that the jury instruction violates his due
process rights, based on <u>Sandstrom v. Montana</u>, 442 U.S. 510 (1979),
because the instruction that intoxication was not relevant relieved
the prosecution of proving Petitioner's <u>mens rea</u> beyond a
reasonable doubt.  (D.E. 100 at 14-16.)  Petitioner contends that
the jury instruction denied him of his right to present a full
defense under <u>Crane v. Kentucky</u>, 476 U.S. 683 (1986). (D.E. 100 at
18-19.)  Hall further argues that the error was highly prejudicial
because his defense was that he did not act with the requisite <u>mens
rea</u> to establish first degree premeditated and deliberate murder.
(<u>Id.</u> at 20.)

The Supreme Court set forth the standard habeas courts must
use when evaluating claims concerning constitutional errors in jury
instructions:

> The only question for us is whether the ailing
> instruction by itself so infected the entire trial that
> the resulting conviction violates due process. . . .  It
> is well established that the instruction may not be
> judged in artificial isolation, but must be considered in
> the context of the instructions as a whole and the trial
> record. . . .  In addition, in reviewing an ambiguous
> instruction such as the one at issue here, we inquire
> whether there is a reasonable likelihood that the jury
> has applied the challenged instruction in a way that
> violates the Constitution. . . .  And we also bear in

mind our previous admonition that we have defined the category of infractions that violate fundamental fairness very narrowly.

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations and internal quotation marks omitted); see also Coe, 161 F.3d at 329 ("To warrant habeas relief, the jury instructions must have been so infirm that they rendered the entire trial fundamentally unfair. An ambiguous, potentially erroneous instruction violates the Constitution only if there is a reasonable likelihood that the jury has applied the instruction erroneously.").

The burden on a habeas petitioner who challenges an erroneous jury instruction "is even greater than that required to demonstrate plain error on direct appeal." Scott v. Mitchell, 209 F.3d 854, 882 (6th Cir.), cert. denied, 531 U.S. 1021 (2000). "Allegations of 'trial error' raised in challenges to jury instructions are reviewed for whether they had a substantial and injurious effect or influence on the verdict, and are subject to harmless-error analysis." Id. (footnote omitted); see also Brecht v. Abrahamson, 507 U.S. 619, 638 (1993) (the harmless error standard applies to "constitutional error of the trial type"); Coe, 161 F.3d at 335 (applying the Brecht harmless-error standard of a substantial and injurious effect on the verdict to determine whether habeas relief was required for a jury instruction).

In Montana v. Egelhoff, 518 U.S. 37 (1996), the United States Supreme Court held that the right to have a jury consider evidence

67

of voluntary intoxication to determine whether the accused
possessed the requisite mental state was not a "fundamental
principle of justice" which if not provided would violate due
process. Egelhoff, 518 U.S. at 51. The Sixth Circuit in Hill v.
Mitchell, 400 F.3d 308 (6th Cir.), cert. denied, 546 U.S. 1039
(2005) noted it has "traditionally recognized a trial judge's
discretion as to whether to instruct a jury on intoxication as a
defense," especially in cases where the evidence does not
reasonably raise intoxication as an issue. Hill, 400 F.3d at 322
(internal citation and quotation marks omitted).

    The Tennessee Supreme Court, when considering the sufficiency
of the evidence in this case, held that

> [o]ur Code provides that while voluntary intoxication is
> not a defense to prosecution for an offense, evidence of
> such intoxication may be admitted to negate a culpable
> mental state. See Tenn[essee] Code Ann[otated] §
> 39-11-503(a) (1991); see also State v. Phipps, 883 S.W.2d
> 138, 148 (Tenn. Crim. App. 1994). The defendant's
> argument that his intoxication rendered him unable to
> form the mental state necessary for first degree murder,
> however, is not persuasive. The defendant's own
> statements to Dutton and Dr. Zager constitute the only
> evidence of intoxication. No witness described the
> defendant as drunk or intoxicated. Furthermore, the
> defendant's conduct in traveling to Mrs. Hall's house,
> disconnecting the telephone, barricading the bedroom
> door, and completing his escape after the killing belies
> the claim that he was incapable of premeditation and
> deliberation.

Hall, 8 S.W.3d at 600. The Court notes that Petitioner attempted
to put on additional evidence during the post-conviction hearing of
his drinking on the night of the murder. Margie Diana Pearson

Case 1:05-cv-01199-JDB-egb Document 110 Filed 04/14/10 Page 69 of 134

testified that she was at a bar that night, but she barely recalled drinking with Petitioner. Hall, 2005 WL 22951, at *10. Alice Jo Pearson remembered having a few drinks with him. Id. However, the limited evidence presented was not sufficient for the Tennessee courts to determine that Petitioner's intoxication negated premeditation and deliberation. See Hill, 400 F.3d at 322 ("[I]ntoxication is not raised as a defense . . . merely because the evidence suggested reduced inhibitions, impaired judgment or blurred appreciation by the Defendant of the consequences of his conduct").

Hall has not satisfied his burden of establishing that the alleged erroneous jury instruction about voluntary intoxication "had a substantial and injurious effect on the jury's verdict." Brecht, 507 U.S. at 627 (internal citation and quotation marks omitted). Though that portion of the jury instruction which stated that intoxication was "irrelevant" was improper, Petitioner has not demonstrated that he is entitled to habeas relief.

> b. <u>Sentencing Phase Instructions</u>
>
> 1. <u>Heinous, Atrocious or Cruel Aggravating Circumstance</u>

In Claims 9 and 10, Petitioner alleged a violation of his Sixth, Eighth and Fourteenth Amendment rights due to the vagueness of jury instructions about the heinous, atrocious or cruel (HAC) aggravating circumstance and that the HAC aggravating circumstance did not fulfill its constitutionally mandated function of directing

69

the jury's sentencing discretion.  (D.E. 15 at 54-55.)  Petitioner

contends that the trial court's definitions of "heinous,"

"atrocious" and "cruel" could apply to any murder and do not

satisfy the Eighth and Fourteenth Amendment narrowing concerns.

(D.E. 100 at 153.)  Petitioner argues that the jury instruction did

not provide that the jury had to find that Petitioner intended to

torture Billie Hall or inflict serious physical abuse in order to

find the HAC aggravating circumstance.  (Id.)

Judge LaFon instructed the jury,

Tennessee law provides that no sentence of death or
sentence of imprisonment for life without possibility of
parole shall be imposed by a jury but upon a unanimous
finding that the State has proved beyond a reasonable
doubt the existence of one or more of the following
statutory aggravating circumstances which are limited to
the following

(1) The murder was especially heinous, atrocious or
cruel in that it involved torture or serious physical
abuse beyond that necessary to produce death; . . .

In the instruction, heinous means grossly wicked or
reprehensible, abominable, odious or vile.

Atrocious means extremely evil or cruel, monstrous,
exceptionally bad, abominable.

Cruel means disposed to inflict plan or suffering,
causing suffering, painful.

Torture means the infliction of severe physical or
mental pain upon the victim while he or she remains alive
and conscious.

Serious physical abuse means or alludes to a matter
or degree.  The abuse must be physical as opposed to
mental, and it must be beyond that which makes improper
use of a thing, or which uses a thing in a manner
contrary to the natural or legal rules for its use.

70

(D.E. 21, Add. 2., Vol. 4, pp. 440-41.)

On direct appeal, Petitioner raised the constitutionality of
the HAC aggravating circumstance and the sufficiency of evidence
related to the HAC aggravating circumstance as issues. <u>Hall</u>, 1998
WL 208051, at *1. On the issue of the constitutionality of the HAC
aggravating circumstance, the Tennessee Court of Criminal Appeals
held:

> The defendant argues that the language of T.C.A. §
> 39-13-204(i)(5) (Supp. 1994) is unconstitutionally vague.
> In his brief, the defendant relies upon <u>Rickman v.
> Dutton</u>, 854 F. Supp. 1305 (M.D. Tenn. 1994), a federal
> district court opinion interpreting the language of the
> pre-1989 aggravating circumstance. The defendant in this
> case was sentenced under the new language of this
> aggravator. The <u>Rickman</u> opinion, therefore, is
> inapplicable here. Moreover, our Supreme Court has
> recently found the language of this aggravating
> circumstance constitutionally sufficient to narrow the
> class of offenders eligible for the death penalty. <u>State
> v. Odom</u>, 928 S.W.2d 18, 26 (Tenn. 1996). The jury was
> properly instructed according to the wording of the
> statute and the definitions provided in <u>State v.
> Williams</u>, 690 S.W.2d 517, 529 (Tenn. 1985) and <u>Odom</u>, 928
> S.W.2d at 26. Thus, there is no error.

<u>Hall</u>, 1998 WL 208051, at *14. On appeal of the post-conviction
determination, the Tennessee Court of Criminal Appeals noted that
the trial court rejected this claim finding it previously
determined. <u>Hall</u>, 2005 WL 22951, at *38.

On the issue of the sufficiency of the evidence as to the HAC
aggravating circumstance, the Tennessee Supreme Court held:

> The defendant also contends that the evidence was
> insufficient to support the jury's finding of aggravating
> circumstance (i)(5) that the murder was "especially
> heinous, atrocious, or cruel in that it involved torture

or serious physical abuse beyond that necessary to produce death." Pursuant to Tenn[essee] Code Ann[otated] § 39-13-206(c) (1997), this Court must review the sufficiency of the aggravating evidence against the mitigating evidence offered and determine the following: whether the sentence of death was imposed in an arbitrary fashion; whether the evidence supports the jury's finding of the existence of each aggravating circumstance beyond a reasonable doubt; whether the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt; and whether the sentence of death is disproportionate.

The "especially heinous, atrocious or cruel" aggravating circumstance may be proved under either of two prongs: torture or serious physical abuse. This Court has defined "torture" as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985). The terms "serious physical abuse beyond that necessary to produce death" are self-explanatory; the abuse must be physical rather than mental in nature. "Abuse" is defined as "an act that is 'excessive' or which makes 'improper use of a thing,' or which uses a thing 'in a manner contrary to the natural or legal rules for its use.' " Odom, 928 S.W.2d at 26 (quoting Black's Law Dictionary 11 (6th ed. 1990)).

The evidence presented in this case supports a finding of the "heinous, atrocious or cruel" aggravating circumstance under either, or both, of the two prongs. We agree with the Court of Criminal Appeals that Mrs. Hall suffered mental torture over the welfare of her children as the defendant beat her in their presence. After hearing the defendant's threats to kill her if the children went for help, she most certainly would have feared for her own fate as well. This Court has repeatedly held that the anticipation of physical harm to one's self or a loved one constitutes mental torture. State v. Carter, 988 S.W.2d 145, 150 (Tenn. 1999); Nesbit, 978 S.W.2d at 886-87; State v. Cauthern, 967 S.W.2d 726, 732 (Tenn. 1998); State v. Hodges, 944 S.W.2d 346, 358 (Tenn. 1997). The evidence here clearly supports a finding of mental torture.

Furthermore, the extent and severity of the beating support a finding of either physical torture or "serious

physical abuse beyond that necessary to produce death"
due to the pain Mrs. Hall suffered before she finally
died.   Therefore, we find the evidence sufficient to
support   the   existence   of   the   (i)(5)   aggravating
circumstance beyond a reasonable doubt.

As  proof  of  mitigating  circumstances,  the  jury  may
reasonably have found that the defendant did not have a
significant history of prior criminal activity, that he
was a good worker and employee, and that he was a caring
and  nurturing  father.   Nevertheless,  we  agree  with  the
jury's   conclusion   that   the   aggravating   circumstance
outweighed   the   mitigating   circumstances   beyond   a
reasonable doubt.   This issue is wholly without merit.

Hall, 8 S.W.3d at 600-02 (footnote omitted).

     The   Eighth   Amendment   requires   that   a   state's   capital

sentencing scheme "channel the sentencer's discretion by clear and

objective  standards  that  provide  specific  and  detailed  guidance,

and  that  make  rationally  reviewable  the  process  for  imposing  a

sentence of death."   Godfrey v. Georgia, 446 U.S. 420, 428 (1980)

(footnotes and quotation marks omitted).   A state's definition of

aggravating  circumstances  must  be  sufficiently  specific  to  avoid

the  arbitrary  and  capricious  infliction  of  the  death  penalty.

     In  Godfrey,  the  United  States  Supreme  Court  determined  that

the aggravating circumstance that the offense "was outrageously or

wantonly  vile,  horrible  or  inhuman  in  that  it  involved  torture,

depravity  of  mind,  or  an  aggravated  battery  to  the  victim"  was

unconstitutionally vague.   Id. at 422, 432-33 (internal citation

and quotation marks omitted).[25]   The trial court's instructions to

---

[25]Previously,  the  Supreme  Court  held  that  this  statutory  aggravating
circumstance was not unconstitutional on its face.   Gregg, 428 U.S. at 202-03.

the jury did not elaborate on this aggravating circumstance, and
the jury recited that a death sentence was imposed because the
murder was "outrageously or wantonly vile, horrible or inhuman."
Id. at 426, 428-29.  The Court, in reaching its decision that the
jury's finding was not sufficiently specific, stated:

> There is nothing in these few words [outrageously or
> wantonly vile, horrible and inhuman], standing alone,
> that implies any inherent restraint on the arbitrary and
> capricious infliction of the death sentence.  A person of
> ordinary sensibility could fairly characterize almost
> every murder as 'outrageously or wantonly vile, horrible
> and inhuman.'  Such a view may, in fact, have been one to
> which the members of the jury in this case subscribed.
> If so, their preconceptions were not dispelled by the
> trial judge's sentencing instructions.  These gave the
> jury no guidance concerning the meaning of any of §
> (b)(7)'s terms . . .

Id. at 428-29; see Maynard v. Cartwright, 486 U.S. 356, 359, 361-64
(1988) (a statutory aggravating factor is unconstitutionally vague
if it fails to furnish principled guidance for the choice between
death and a lesser penalty).

A state appellate court may cure an unconstitutionally vague
aggravating circumstance by adopting a narrowing construction on
appeal.  The Supreme Court has specifically held that a state
satisfies the constitutional requirement that it limit sentencing
discretion by adopting a constitutionally narrow construction of a
facially vague aggravating circumstance, and by applying that
construction to the facts of a particular case.  Richmond v. Lewis,
506 U.S. 40, 46-47 (1992); Lewis v. Jeffers, 497 U.S. 764, 779

(1990); <u>Walton v. Arizona</u>, 497 U.S. 639, 652-53 (1990), <u>overruled by Ring v. Arizona</u>, 526 U.S. 584 (2002).

The Tennessee Supreme Court adopted a narrowing construction of the statutory HAC aggravating circumstance in <u>State v. Williams</u>, 690 S.W.2d at 517, 529-30 (Tenn. 1985). The trial court in Petitioner's case appropriately instructed the jury, using the definitions of "heinous," "atrocious," "cruel" and "torture" enunciated in <u>Williams</u>. The Tennessee Supreme Court's decision cites <u>Williams</u> as the applicable narrowing construction. <u>Hall</u>, 8 S.W.3d at 601.[26] Further, the Tennessee Supreme Court correctly applied <u>Jackson v. Virginia</u>, 443 U.S. 307, 318-19 (1979)[27] in determining that the evidence was sufficient to support the jury's determination that the HAC aggravating circumstance was proven beyond a reasonable doubt.

The Tennessee Supreme Court's decision was neither contrary to nor an unreasonable application of clearly established federal law and was based on a reasonable determination of the facts in light of the evidence presented. Claim 9, as it relates to the HAC aggravating circumstance, and Claim 10 are without merit.

> 2. <u>Instruction to Consider Only Aggravating Circumstances</u>

---

[26]<u>See also</u> <u>Hall</u>, 1998 WL 208051, at *14 (The Tennessee Court of Criminal Appeals found no error where "[t]he jury was properly instructed according to the wording of the statute and the definitions provided in" <u>Williams</u>.)

[27]<u>See infra</u> pp. 79, 81-82.

Hall claims that Judge LaFon instructed the jury to consider only aggravating circumstances in deciding whether the death penalty was an appropriate punishment. (D.E. 15 at 54.) Respondent asserts that this claim has been procedurally defaulted. (D.E. 90-1 at 20.) Petitioner's contentions that this issue is not procedurally defaulted based on § 39-2-205(c) (repealed), Rule 52, and ineffective assistance of Petitioner's appellate counsel (D.E. 100 at 129-32, 135-37) are without merit. See supra pp. 53-54.

3.   Unanimity Instruction

Petitioner alleges that Judge LaFon instructed the jury that a life verdict required a unanimous decision. (D.E. 15 at 54.) Respondent notes that Petitioner challenged the constitutionality of the unanimity instruction under the Eighth Amendment on appeal to the Tennessee Supreme Court, but not under the Sixth or Fourteenth Amendments. (D.E. 90-1 at 21.) Petitioner asserts that he fairly presented his Eighth and Fourteenth Amendment claims in state court by citing McKoy v. North Carolina, 494 U.S. 433 (1990), and Mills v. Maryland, 486 U.S. 367 (1988), cases that consider Eighth and Fourteenth Amendment challenges to jury instructions, in his Tennessee Supreme Court brief. (D.E. 100 at 128.) Petitioner's Sixth Amendment claim related to the unanimity instruction is procedurally defaulted.[28]

---

[28]To the extent Petitioner claims that § 39-2-205(c), Rule 52, and ineffective assistance of appellate counsel provide a basis for this Court's review of the unexhausted Sixth Amendment claim (see D.E. 100 at 129-32, 135-36), this argument fails. See supra pp. 53-54.

The Tennessee Supreme Court ruled on the Eighth Amendment claim, as follows:

> The defendant argues that the trial court's instruction to the jury that they must unanimously agree on whether the statutory aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt violates his Eighth Amendment right to have each juror consider and give effect to mitigating circumstances. See McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), and Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). In McKoy and Mills, the Court held that sentencing schemes that permit jurors to consider only unanimously found mitigating circumstances in determining whether the aggravating circumstances are sufficient to justify imposition of death penalty impermissibly limit the jurors' consideration of mitigating evidence in violation of the Eighth Amendment. See McKoy, 494 U.S. at 438-44, 110 S. Ct. 1227; Mills, 486 U.S. at 383-84, 108 S. Ct. 1860.

> The challenged instruction read as follows:

> If you unanimously determine that at least one statutory aggravating circumstance have [sic] been proven by the State beyond a reasonable doubt and said circumstance or circumstances have been proven by the State to outweigh any mitigating circumstance or circumstances beyond a reasonable doubt, the sentence shall be death.

> We note that the defendant did not object to this instruction when it was given, nor did he raise it as an issue in his Motion for New Trial or in the Court of Criminal Appeals. Normally, the defendant's failure to take any action to call this issue to the trial court's attention will preclude review on appeal. Tenn. R. App. P. 3(e), 36(a). In any event, we note that this instruction fully complied with the requirements of Tenn[essee] Code Ann[otated] § 39-13-204(g)(1) (1991), requiring proof of at least one aggravating circumstance beyond a reasonable doubt and a determination that such aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt. Furthermore, the trial court also instructed the jurors that "[there is no requirement of jury unanimity as to any particular mitigating circumstance or that you agree on the same

77

mitigating circumstance." This instruction satisfies any
Eighth Amendment concerns under <u>McKoy</u> or <u>Mills</u>. This
issue is without merit.

<u>Hall</u>, 8 S.W.3d at 602-03.

In <u>Mills</u>, the Supreme Court held that sentencing instructions
that create a substantial likelihood that reasonable jurors might
think that they are precluded from considering any mitigating
evidence in the absence of unanimity are constitutionally invalid.
<u>Mills</u>, 486 U.S. at 384. The Court looked at whether a reasonable
jury might have interpreted the instruction in a way that is
constitutionally impermissible. <u>Id.</u> at 373-76; <u>see also</u> <u>Boyde v.
California</u>, 494 U.S. 370, 380 (1990) ("whether there is a
reasonable likelihood that the jury has applied the challenged
instruction in a way that prevents the consideration of
constitutionally relevant evidence").

Petitioner's argument that the jury was erroneously told that
the decision to impose a life sentence requires a unanimous verdict
has been rejected by the Sixth Circuit. <u>See</u> <u>Abdur'Rahman v. Bell</u>,
226 F.3d 696, 711-13 (6th Cir. 2000); <u>Coe</u>, 161 F.3d at 339-40. In
<u>Coe</u>, the Sixth Circuit considered whether jury instructions were
unconstitutional because they could have been interpreted as
requiring the jury unanimously to find mitigating circumstances.
<u>Coe</u>, 161 F.3d at 337. The Sixth Circuit determined that jury
instructions similar to those at issue were constitutional based on
<u>Mills</u>. <u>Id.</u> at 338. The Sixth Circuit reasoned that the jury

78

instructions "require[] unanimity as to the results of the *weighing*, but this is a far different matter than requiring unanimity as to the *presence* of a mitigating factor." <u>Id.</u> (emphasis in original). Accordingly, the court concluded that nothing in the language of the jury instructions could reasonably be taken to require unanimity as to the presence of a mitigating factor. <u>Id.</u> Given the similarity in the sentencing phase instructions in <u>Coe</u> and the instant case, the Court concludes that the state court's decision was not an unreasonable application of federal law as determined by the United States Supreme Court. Petitioner's claim is without merit.

Claims 9 and 10 are DENIED.

J.    <u>Trial Judge Lacked Impartial and Independent Judgment (Claim 11)</u>

Hall alleges that Judge LaFon did not exercise impartial and independent judgment, but merely did what District Attorney Woodall told him to do. (D.E. 15 at 55.) He asserted that, prior to the sentencing hearing, Woodall stated, "Thank goodness (Judge LaFon will) do what I tell him to do . . . ." (<u>Id.</u> at 44.)

Respondent asserts that Petitioner's claim is procedurally defaulted for failure to raise the issue in the Tennessee state courts. (D.E. 90-1 at 23.) Petitioner did not raise this claim in the Tennessee courts. He has not demonstrated cause and prejudice for the failure to exhaust this claim or that the Court's failure to review these claims would result in a miscarriage of justice.

79

Claim 11 is procedurally defaulted and DENIED.

K.    Sufficiency of the Evidence (Claim 12)

Petitioner asserts that Billie Hall died in "a tragic, passionate, domestic disturbance," not from a deliberate, premeditated plan and that his Sixth, Eighth and Fourteenth Amendment rights were violated because the evidence does not support the first degree murder conviction and resulting sentence. (D.E. 15 at 55; D.E. 100 at 154.)

On direct appeal, the Tennessee Supreme Court held:

The defendant contends that the record establishes a killing premised on anger, passion, and alcohol rather than a premeditated and deliberate murder.  His is a two-part argument: first, he claims that the passion and anger aroused by his fight with his wife had not subsided when he killed her; second, he claims that his intoxication rendered him unable to form the mental state necessary for first degree murder.

When the sufficiency of the evidence is challenged, the standard for review by an appellate court is whether, after considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); State v. Burns, 979 S.W.2d 276, 286-87 (Tenn. 1998); Tenn. R. App. P. 13(e).  On appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.  See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  In determining the sufficiency of the evidence, this Court does not reweigh the evidence, see id., or substitute its inferences for those drawn by the trier of fact, see Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956).  A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence.  See Burns, 979 S.W.2d at 287; State v. Grace,

493 S.W.2d 474, 476 (Tenn. 1973). On appeal, the appellant bears the burden of proving that the evidence is insufficient to support the jury verdict. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

At the time of this homicide, the Code defined first degree murder as "[a]n intentional, premeditated and deliberate killing of another." Tenn[essee] Code Ann[otated] § 39-13-202(a)(1) (1991). A homicide, once proven, is presumed to be second degree murder, and the State has the burden of proving the elements of premeditation and deliberation to raise the offense to first degree murder. State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998).

["Intentional" is defined as the "conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18) (1991). Proving premeditation requires evidence of "a previously formed design or intent to kill," Nesbit, 978 S.W.2d at 898; State v. West, 844 S.W.2d 144, 147 (Tenn. 1992), and "the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-201(b)(2) (1991) (repealed 1995). Proving deliberation requires evidence of a cool purpose formed in the absence of passion or provocation. See Tenn. Code Ann. § 39-13-201(b)(1) (1991) (repealed 1995) & Sentencing Commission Comments; State v. Brown, 836 S.W.2d 530, 539-40 (Tenn. 1992) (citations and internal quotations omitted). Deliberation also requires "some period of reflection during which the mind is free from the influence of excitement." Brown, 836 S.W.2d at 540. A killing committed during a state of passion, however, may still rise to the level of first degree murder if the State can prove that premeditation and deliberation preceded the struggle. See Franks v. State, 187 Tenn. 174, 213 S.W.2d 105, 107 (1948); Leonard v. State, 155 Tenn. 325, 292 S.W. 849 (1927).

The evidence in this case, when viewed in the light most favorable to the State, demonstrates the following. The defendant contacted Mrs. Hall on the day of the murder to arrange for a meeting. Although the defendant arranged the meeting under the guise of delivering a child-support check, he actually wanted to meet with Mrs. Hall to attempt to persuade her to reconcile. As the defendant later told fellow prisoner Dutton, if Mrs. Hall were unwilling to reconcile, he intended "to make her feel as

he did. He wanted her to suffer as he did, feel the
helplessness that he was feeling because she took his
world away from him." Prior to entering the house, the
defendant disconnected the telephone lines to prevent
Mrs. Hall from calling for help. At some point either
before or during his attack, the defendant told Mrs. Hall
that she "would never live to graduate." Finally, during
the attack, the defendant told the children that he would
kill their mother if they went for help. The evidence of
planning, the expression of defendant's intent to kill or
hurt Mrs. Hall, the severity of the beating, and the
manner of death establish the existence of pre-meditation
and deliberation and support a conviction for first
degree murder beyond a reasonable doubt.

. . .

Having reviewed the entire record, we conclude that a
rational trier of fact could have found the essential
elements of premeditated and deliberate first degree
murder beyond a reasonable doubt. Tenn. R. App. P.
13(e). This issue, therefore, is without merit.

Hall, 8 S.W.3d at 599-600.[29] The Tennessee Supreme Court also

addressed the sufficiency of the evidence as it related to the HAC

aggravating circumstance and found the issue to be without merit.

See infra pp. 70-74.

In Jackson, the Supreme Court held that,

in a challenge to a state criminal conviction brought
under 28 U.S.C. § 2254 — if the settled procedural
prerequisites for such a claim have otherwise been
satisfied -— the applicant is entitled to habeas corpus
relief if it is found that upon the record evidence
adduced at the trial no rational trier of fact could have
found proof beyond a reasonable doubt.

---

[29]The Tennessee Supreme Court also discussed Petitioner's involuntary
intoxication argument and whether there was sufficient evidence to negate a
culpable mental state. Hall, 8 S.W.3d at 600. This Court previously determined
that Petitioner is not entitled to habeas relief regarding evidence of
involuntary intoxication. See supra pp. 62-68.

Jackson, 443 U.S. at 324.  This standard requires a federal
district court to examine the evidence in the light most favorable
to the State.  Id. at 324, 326 ("a federal habeas corpus court
faced with a record of conflicting facts that supports conflicting
inferences must presume —– even if it does not affirmatively appear
in the record —– that the trier of fact resolved any such conflicts
in favor of the prosecution, and must defer to that resolution").

The Tennessee Supreme Court, expressly referring to Jackson,
reviewed the evidence presented at trial and applied that clearly
established precedent correctly and in an objectively reasonable
manner.  As set forth in the opinion, there is no question that,
viewed in the light most favorable to the prosecution, a rational
juror could find Petitioner guilty of first degree murder.  The
jury heard the testimony of all the witnesses.  Any conflicts in
that testimony were resolved against Petitioner.  The testimony and
evidence, including the evidence that Petitioner planned to go to
the house to attempt to get Billie to reconcile, to cause her to
suffer if she would not reconcile, the severity of the beating
prior to Billie's death, and the manner of death, were sufficient
to establish the existence of premeditation and deliberation.

Additionally, evidence that Billie Hall suffered mental
torture because of Petitioner's threats to kill her children and
physical torture or serious physical abuse based on the extent and
severity of the beating was sufficient to establish proof of the

aggravating circumstances.  See Hall, 8 S.W.3d at 601.  Further,
the Tennessee Supreme Court held that the aggravating circumstance
outweighed the mitigating circumstances beyond a reasonable doubt.
Id.  Even if a possibility existed that Petitioner could clear the
hurdle erected by § 2254(d), this Court would be bound by the
Tennessee Supreme Court's factual determinations, and those
findings require the conclusion that the jury verdict and sentence
complied with Jackson.

Claim 12 is without merit and is DENIED.

L.   Ineffective Assistance of Counsel (Claim 13)

Hall contends that his Sixth, Eighth and Fourteenth Amendment
rights were violated due to ineffective assistance of counsel on
multiple grounds.  (See D.E. 15 at 55-61.)

1.   Failed to obtain and present evidence from Hall's family
     and other sources including Carol Alexander, Kathy Hugo,
     Debbie Davis, Jay Hall, Jeff Hall, Sheryl Arbogast, Joel
     Hall, Beth Hall, Carla Ulery, Scott Smith, school
     records) respecting Mr. Hall's social history;

2.   Failed to obtain and present evidence from Hall's family,
     friends, acquaintances, doctors, prison and jail
     personnel providing an explanation for the homicide;

3.   Failed to obtain and present evidence that at the time of
     the offense, a biologically driven deficit interfered
     with his ability to exercise reflection and judgment for
     his actions;

4.   Failed to get a change of venue;

5.   Failed to keep the trial in Henderson County;

6.   Selected a jury consisting of eleven women and one man;

7.   Failed to correct District Attorney Woodall's voir dire intimation that a first-degree murder required a death sentence;

8.   Failed to correct Judge LaFon's statement that the jury sentence would be advisory;

9.   Failed to correct Judge LaFon's statement that the only purpose of the trial would be to ascertain guilt;

10.  Agreed to the striking for cause of juror Bozza;

11.  Failed to object to Billie Hall's family members sitting with prospective jurors during voir dire;

12.  Failed to establish that Hall disconnected telephone lines to Billie Hall's house so Billie Hall wouldn't call the police and inform them that Hall was violating a protection order;

13.  Failed to establish that Chris Dutton's testimony was a lie;

14.  Failed to establish that the testimonies of Hall's daughters were not accurate;

15.  Failed to demonstrate that crime scene photographs presented to the jury were inaccurate;

16.  Failed to establish that Dr. O.C. Smith's testimony was inaccurate and unfounded;

17.  Failed to preserve Jeff Hall's testimony about Hall's mental state in the days and weeks prior to the Billie Hall homicide;

18.  Failed to present at the sentencing stage the testimony of Sheryl Arbogast about what Jeff Hall told her about Hall's mental state in the days and weeks prior to the homicide;

19.  Failed to establish that Hall was not capable of assisting in his defense;

20.  Told Judge LaFon that Hall had knowingly and voluntarily waived his right to testify;

21. Failed to recognize the difference between premeditation and deliberation under Tennessee law;

22. Inaccurately referred to a Bible passage respecting the crucifixion of Jesus Christ;

23. Failed to challenge proportionality review; and

24. Failed to raise at trial and on appeal any claim that "this Court rules is procedurally defaulted."

(Id.)

Respondent contends that Petitioner raised the following Sixth Amendment ineffective assistance of counsel claims in the state court:

1. Failing to properly present an intoxication defense;

2. Failing to establish that the victim was the aggressor;

3. Failing to present the testimony of Jeff Hall;

4. Failing to present evidence of the petitioner's habit of disconnecting telephone lines;

5. Failing to properly present the mental health issue;

6. Failing to present evidence that Hall was a good father and evidence of other good acts;

7. Failing to develop a defense strategy; and

8. Failing to interview all potential witnesses.

(D.E. 90-1 at 26-27.) Respondent acknowledges that these claims are "arguably interspersed through Petitioner's ineffective assistance of counsel" claims in his habeas petition. (D.E. 90-1 at 26.) The Warden contends that claims not raised in the state

86

courts, including Petitioner's Eighth and Fourteenth Amendment claims, are procedurally defaulted. (Id. at 26-27.)

Petitioner submits that Respondent has waived the procedural default defense because he failed to identify which portions of Claim 13 are procedurally defaulted. (D.E. 100 at 123.)  The type of specificity Petitioner seeks for Respondent to assert the defense of procedural default is not required.

Hall does not show cause and prejudice for the failure to exhaust the claims not raised in the state court, or that a miscarriage of justice would result from the Court's failure to review the unexhausted ineffective assistance of counsel claims. He merely addresses certain issues on the merits. (See D.E. 100 at 72-119.)

Even to the extent Respondent may not have raised the issue of procedural default properly, district courts are permitted to raise this issue sua sponte if the petitioner has been afforded the opportunity to respond. See Palmer v. Bagley, 330 F.App'x 92, 105 (6th Cir. 2009), cert. denied, 78 U.S.L.W. 3521, 2010 WL 757725 (U.S. Mar. 8, 2010) (holding that the court did not abuse its discretion in raising procedural default sua sponte where petitioner had been given a fair opportunity to advance his argument prior to the ruling);[30] Howard v. Bouchard, 405 F.3d 459,

---

[30]The Supreme Court has not decided the issue of whether district courts are entitled to dismiss claims sua sponte for procedural default.  Flood v. Phillips, 90 F.App'x 108, 114 (6th Cir. 2004).  The Supreme Court has ruled that federal appellate courts are not required to raise procedural default sua sponte

476 (6th Cir. 2005), <u>cert. denied</u>, 546 U.S. 1100 (2006) ("The main concern with raising procedural default sua sponte is that a petitioner not be disadvantaged without having had an opportunity to respond"); <u>Lorraine v. Coyle</u>, 291 F.3d 416, 426 (6th Cir. 2002), <u>cert. denied</u>, 538 U.S. 947 (2003) (courts of appeal may raise procedural default <u>sua sponte</u>).  Petitioner has had the opportunity to respond to assertions of procedural default since the answer was filed.  The Court will examine those claims that are clearly exhausted and determine to what extent Petitioner has raised the exhausted claims in the context of its habeas petition.

1.   <u>Failure to present an intoxication defense</u>

During the post-conviction proceedings, Hall alleged that his counsel was ineffective for failing to present an intoxication defense and for not calling Diana and Alice Pearson as witnesses. (D.E. 21, Add. 8, Vol. 1, pp. 26-27.)  In his habeas petition, Petitioner claimed that his counsel did not obtain evidence from Diana and Alice Pearson that would explain the homicide (D.E. 15, ¶ 260) and failed to present evidence that Petitioner "consumed numerous beers, smoked marijuana and ingested Stay alert pills" prior to the homicide (<u>id.</u> at ¶ 260.6).

In its opinion, the Tennessee Court of Criminal Appeals first addressed the Sixth Amendment standard for assistance of counsel and <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  <u>Hall</u>, 2005 WL

---

when the state fails to do so.  <u>Trest v. Cain</u>, 522 U.S. 87, 89 (1997).

22951, at **25-27.  Then, the Tennessee Court of Criminal Appeals

found as follows:

> The petitioner contends that trial counsel failed to
> present evidence of intoxication properly to negate his
> ability to form the requisite intent to establish
> premeditation.  He complains that trial counsel "failed
> to produce one shred of evidence regarding intoxication."
> In this regard, the petitioner contends that trial
> counsel was ineffective for failing to locate and present
> the testimony of Diana Pearson and Alice Pearson.  At the
> post-conviction hearing, the petitioner presented their
> testimony.  Both said that they were at a bar on July 29,
> 1994, and that they could barely recall having drinks
> with the petitioner.
>
> Mr. Ford testified that intoxication, while not a defense
> to murder, was a part of their defense theory.  He said
> that he was unsuccessful in his attempt to locate
> witnesses who knew of the petitioner's alcohol problem.
> Moreover, the petitioner refused to testify.  Mr. Ford
> stated that the defense was unable to pursue this avenue
> at trial based on these factors.
>
> The trial transcript reveals that evidence of
> intoxication was presented through the testimony of
> several witnesses:
>
> 1.  On cross-examination, Chris Dutton acknowledged
> telling the authorities that the petitioner had stated
> that he had started drinking after he spoke with the
> victim on the telephone on the day of the murder and that
> he was drunk at the time of the incident.
>
> 2.  On cross-examination, one of the petitioner's
> daughters, Cynthia Lambert, admitted that he had brought
> beer with him to the victim's home and that he started
> drinking one of the beers in her presence.
>
> 3.  Dr. Lynn Zager, a defense witness, testified to the
> petitioner's alcohol dependence problem and that, at the
> time of the incident, he was intoxicated on alcohol.  On
> cross-examination, Dr. Zager stated that her information
> as to the petitioner's intoxication at the time of the
> offense was not based solely upon the petitioner's
> self-report, but also on interviews of persons with the
> petitioner "shortly before the incident" that were

conducted by Mike Mosier, previous counsel for the petitioner.

Additionally, Dr. Zager relied upon information provided by the petitioner's family regarding his alcohol problem.

We conclude, as did the trial court, that the trial transcript directly refutes the petitioner's claim that trial counsel failed to present any evidence of intoxication. Moreover, we cannot conclude that counsel was deficient for failing to present the testimony of either Alice or Diana Pearson. Neither witness could testify regarding the amount of alcohol consumed by the petitioner. Neither witness could testify as to whether the petitioner appeared intoxicated. Indeed, both witnesses could barely remember sharing drinks with him at all. The petitioner has failed to establish how the testimony of these witnesses was relevant to a theory of intoxication, and he has failed to establish either deficient performance or resulting prejudice.

Additionally, while the petitioner could have testified as to the level of his intoxication before the murder, the petitioner decided not to testify. Counsel cannot be found ineffective for the petitioner's decision not to testify. The petitioner is not entitled to relief on this claim.

Hall, 2005 WL 22951, at **27-28.

This is "a run-of-the-mill state-court decision applying the correct legal rule" from Strickland to the facts of Petitioner's case and, therefore, it does not "fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams v. Taylor, 529 U.S. 362, 406 (2000). The Tennessee Court of Criminal Appeals' decision was neither contrary to nor an unreasonable application of clearly established federal law and was based on a reasonable determination of the facts in light of the evidence presented. Petitioner's claim is without merit.

2.   <u>Failed to establish the victim as the aggressor</u>

During the post-conviction proceedings, Petitioner alleged that the testimony of his sisters and Jackie and Darlene Brittain clearly established that Billie Hall was "capable of goading the Petitioner," that this evidence was essential to present a case of manslaughter, and that there was no rational reason not to present the testimony.  (D.E. 21, Add. 8, Vol. 1, p. 27.)  In his habeas petition, Petitioner argued that his counsel failed to obtain and present evidence from his family and the Brittains that "Billie Hall physically, verbally, and mentally abused Mr. Hall" (D.E. 15, ¶ 260.1); that "[a]ny time Mr. Hall made an effort to leave Billie Hall, she interfered to ensure that she maintained control over Mr. Hall" (<u>id.</u> at ¶ 260.2); and that Petitioner's relationship with Billie Hall was deteriorating (<u>id.</u> at ¶ 260.3.4).

On this issue, the Tennessee Court of Criminal Appeals held:

> The petitioner asserts that the post-conviction testimony of his siblings "and the Brittains clearly establish[s] that the victim was capable of goading the petitioner." He contends that this evidence established provocation and was essential to establish the circumstances for voluntary manslaughter. Trial counsel testified that they made a strategic decision not to attack the character of the victim because it ran the risk of alienating the jury. Mr. Mayo also said that as best as he could recall, the victim's acts against the petitioner were not severe enough to imply that his conduct was reasonable. Both Mr. Mayo and Mr. Ford stated that the petitioner was the only reliable source to establish the victim's acts of violence but that he refused to testify.
>
> Briefly summarized, the facts established that the petitioner disconnected the telephone lines, forced his way into the victim's home, and violently attacked her as

the children jumped on his back, bit him, and pleaded for him to stop hurting their mother. The fight continued outside, where the petitioner dragged the victim across the driveway and to the back of the house. There, he held her under the water in the children's swimming pool. No evidence showed that the victim provoked the petitioner immediately before his actions that resulted in her death. The trial court concluded that in light of these facts, evidence of the victim's prior acts of aggression upon the petitioner would not have assisted counsel in establishing that the victim was the first aggressor on this occasion. Additionally, the trial court found that the testimony of Dr. Zager and Randy Helms communicated to the jury that the petitioner was emotionally distraught and acting in an impulsive manner.

During the petitioner's trial, counsel attempted to negate the element of premeditation by presenting evidence of mental health issues and intoxication rather than attempt to establish the provocation necessary to support a voluntary manslaughter verdict. The state possessed a sufficient amount of information reflecting prior acts of violence by the petitioner against the victim, but did not seek introduction of this evidence at trial. However, had the defense attempted to establish the victim as the first aggressor, the state could have presented such information to discredit any indication that the victim provoked the petitioner. The defense strategy not to portray the victim as the aggressor was reasonable, given the risk of the backlash from attacking the deceased victim's character. <u>See, e.g.</u>, <u>Heiman v. State</u>, 923 S.W.2d 622, 627 (Tex. Crim. App. 1995) (stating it was sound trial strategy to refrain from attacking the victim's character as it was conceivable that the jury would have found this strategy repugnant). Accordingly, the petitioner has failed to establish that counsel was deficient by failing to pursue this theory of defense. He is not entitled to relief as to this claim.

<u>Hall</u>, 2005 WL 22951, at **28-29.

Petitioner asserts that he was denied the effective assistance of counsel because his counsel failed to fully investigate, prepare and present the "facts and circumstances of their tempestuous relationship," and other evidence which was indispensable to the

jury's decision on the core issue.  (D.E. 100 at 110.)  He contends that his counsel's failure to present proof of their turbulent relationship prejudiced him because it was crucial to determining his <u>mens rea</u>.  (D.E. 100 at 113.)

During the post-conviction hearing, Petitioner's sister Debbie Davis testified,

> Just —- Their relationship was kind of funny.  I can tell you one instance where they were in the driveway. . . . Billie came over to the house.  She was upset about -- I don't know whether he had the wrong car or what was going on.  But anyway, I saw her get out of the car.  I was in the house.  And she was angry about something. I've seen her -- then she started like kicking at him at his groin area, and then he just kind of like pushed her away and was turning around and then she would go after him, hitting --
>
> . . .
>
> So whenever he was putting her in a headlock, I came out of the house and said, "What are you guys doing," and then they just pretended they were horsing around.  So, it was like they didn't exactly want you to know that they were fighting or arguing.  That was just the nature of their relationship.  They did that kind of stuff all the time.  And on occasions I would see her kick -- go try to kick him in the groin or -- They just were like that.

(D.E. 21, Add. 7, Vol. 1, pp. 40, 43.)  Davis also provided that, "Yes, she did put Jon down.  She would tell him he was stupid, yes."  (<u>Id.</u> at 45, 54.)  She indicated that the attorney told them not to say anything negative about Billie because she was the victim and it would make them look bad in court.  (<u>Id.</u> at 46.)

Petitioner's sister Sheryl Arbogast also testified at the post-conviction hearing as follows:

> She (Billie) berated him all the time. She just
> constantly was saying negative things about him, whether
> he was in the room or whether he wasn't. She was brow-
> beating him. She was saying things like he wasn't able
> to provide for the family and that he wasn't pulling his
> weight and she had to do everything, but what I observed
> was Jon doing the child care and the cooking and the
> cleaning of the house and all of those things.

(<u>Id.</u> at Add. 7, Vol. 2, pp. 166-67.)  Arbogast also related that
she told the attorneys there had been altercations when Billie had
left bite marks on Petitioner, but she was not asked about this at
trial.  (<u>Id.</u> at 173-74.)  Arbogast admitted that she did not
personally observe the bite marks, but she heard about them from
her mother.  (<u>Id.</u> at 206.)  She also testified that Petitioner's
brother Jeff Hall had told her about the times when Billie had
pointed a gun in Petitioner's face after he went to the house to
pick up some things.  (<u>Id.</u> at 190, 194.)

Hall presented Arbogast's affidavit which stated,

> Billie was abusive to Jon. She bit him and kicked him in
> the balls. Billie even pulled a gun on him. When the
> police gave him the restraining order he showed them his
> bruises. She was violent and she provoked him. . . .

(D.E. 102-43 at 6.)  She noted,

> Jon told Jeff how Billie was trying to coax him into
> killing himself, and also how at one point Billie had
> even pulled a gun on him while the girls were present.

(<u>Id.</u>)

Petitioner's sister Kathy Hugo testified that on the night
before the trial, Petitioner's attorney told them not to say
anything bad about Billie.  (D.E. 21, Add. 7, Vol. 2, at 273.)

94

Hugo was never at Petitioner's house, and most of what she knew about the Hall marriage came from her mother or sisters. (Id. at 283-84.)

Jackie Brittain testified at the post-conviction hearing that he knew Billie had asked Petitioner to leave the house and had obtained a restraining order against him. (Id. at 219.) He also stated that he "got to see (the) restraining order being broke by the deceased coming by to try to talk to him." (Id.) On cross-examination, Brittain admitted that he made a statement to the TBI that Petitioner had threatened to hurt his wife, but he claimed that he and Petitioner were joking around at the time. (Id. at 241, 243.)

Pamela Brittain testified that Billie Hall treated Petitioner "like shit" and that she was "extremely commanding and demanding and abusive to him." (Id. at 250.) Billie allegedly hit and kicked Petitioner. (Id.) Pamela stated,

> She was constantly bitching at him, you know. She would downgrade him, like he wasn't worth anything, that he couldn't do anything right.

(Id. at 251.) Pamela claimed that she never provided this information to any of Petitioner's attorneys because she was never asked. (Id.) Pamela also testified that Billie would come to her house to see Hall and try to provoke him, despite the protective order. (Id. at 253-54.) Pamela claims that she went to the trial, but Petitioner's attorney told her that they did not want to use

95

her testimony because of a statement she made to the TBI about Petitioner turning Billie into "ground hamburger meat." (Id. at 257-58.) She denied making that statement. (Id. at 256-57.)

Petitioner's trial attorney Mr. Mayo testified, "Mr. Hall I remember wanted us to argue self-defense, but that was -- I think would have definitely alienated the jury and inflamed them, which we didn't want to do." (D.E. 21, Add. 7, Vol. 3, at 302.) Mayo expressed that they thought Petitioner's testimony was the only way to put on evidence of provocation, but they were concerned because his "demeanor in the courtroom was very bad, very scary, and having him on the stand strategically would have been horrible." (Id. at 307, 311-12.)[31] Mayo expressed that he thought it was impossible to get voluntary manslaughter. (Id. at 310-11.)

> Q    So in that regard, if you'd had any testimony that Billie had been violent toward Jon, you would have probably reasonably used that; would you not?
>
> A    You know, again, that's -- I think that my recollection again is not real specific. I can't tell you exactly what occurred back then, but I think that we're getting into the area of strategy, and I can think of reasons that we would not have tried to develop any past incidences of violence between the two of them. For example, if I may, if they weren't very severe, and we tried to promote or imply that Mr. Hall's conduct was reasonable, you know, strategically I think we're looking at the jury, trying to convince them that what he did that day was reasonable in light of the provocation, and I think that would have been impossible. So, yeah, you

---

[31]Petitioner's other trial attorney, Jesse Ford, testified that the only reliable evidence that Billie Hall was abusive toward Petitioner was his own testimony and that Petitioner refused to testify despite their advice. (D.E. 21, Add. 7, Vol. 3, at 393-95.)

know, you want to move downward. You want to move down
past second degree and get voluntary, but realistically,
I mean, come on. There was no chance.

(Id.) Mayo recalled that Petitioner and Billie had been in fights
before, but he had no specific recollection of a witness with
evidence of provocation. (Id. at 312, 353-54.)

This is "a run-of-the-mill state-court decision applying the
correct legal rule" from Strickland to the facts of Petitioner's
case and, therefore, it does not "fit comfortably within §
2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406.
Petitioner makes no effort to demonstrate that the state-court
decision is objectively unreasonable, rather than merely incorrect.
Id. at 410. Further, the information provided by Petitioner does
not demonstrate provocation or that Billie acted aggressively
toward Petitioner. See Callins v. Collins, 998 F.2d 269, 278 (5th
Cir. 1993), cert. denied, 510 U.S. 1141 (1994) (no ineffective
assistance of counsel where petitioner failed to introduce any
evidence of provocative or aggressive actions).

In Matylinski v. Budge, 577 F.3d 1083, 1088 (9th Cir. 2009),
a case factually similar to Petitioner's, the petitioner returned
home to his pregnant wife after an evening of drinking and
ingesting illicit substances. Domestic violence ensued resulting
in the victim receiving as many as forty blows to her head, her
hair was torn from her scalp, and blood was splattered throughout
the house. Matylinski, 577 F.3d at 1088-89. The petitioner claims

that his counsel was ineffective because of a strategic decision not to use provocation as an excuse to mitigate murder to manslaughter. Id. at 1091. The petitioner claimed that his counsel "should have argued manslaughter as opposed to murder because Peggy provoked him, causing him to repeatedly beat her in self defense." Id. The petitioner's trial counsel explained that he chose the intoxication defense as opposed to provocation because "it's contrary . . . to human nature to believe there is any adequate provocation for what we see [in the pictures of the victim]." Id. at 1092 n.3. The Ninth Circuit found the petitioner's claim was without merit because counsel was reasonable in his belief that efforts to pursue a strategy that the petitioner was provoked would have further harmed the petitioner's case. Id. at 1092.

Similarly, in the instant case, Petitioner has not demonstrated that the state court's decision that there was no ineffective assistance of counsel for failure to show Billie Hall as the aggressor was an unreasonable application of federal law. Petitioner has not presented any evidence, even with the submission of additional affidavits in the habeas proceeding from Petitioner's sisters, that reflects that counsel could have found additional information, other than Petitioner's own testimony, that would have proved provocation to the extent that the jury would have convicted him of a lesser offense. The Tennessee Court of Criminal Appeals's

decision was neither contrary to nor an unreasonable application of clearly established federal law and was based on a reasonable determination of the facts in light of the evidence presented.

3.   <u>Failed to preserve the testimony of Jeff Hall</u>

During the post-conviction proceedings, Petitioner alleged his counsel failed to preserve the testimony of Jeff Hall, Petitioner's brother who was dying with AIDS.  (D.E. 21, Add. 8, Vol. 1, p. 27.) In his habeas petition, the inmate claimed that his counsel did not obtain Jeff's statement concerning Petitioner's mental state in the days and weeks prior to the homicide (D.E. 15 at ¶ 262.14) and that counsel failed to present Arbogast's testimony at the sentencing stage about what Jeff would have said on this same subject (<u>id.</u> at ¶ 262.15).  (<u>See id.</u> at ¶¶ 133-34, 154, 160, 169 & 209.11.)  Hall also argues that his counsel did not secure and present evidence from Petitioner's family and friends about the stressors in his life, such as his brother's health, his daughter's health and special needs, financial problems, and the deterioration of his relationship with Billie.  (<u>Id.</u> at ¶ 260.3.)

These claims were all addressed in Petitioner's post-conviction arguments related to the failure to preserve Jeff's testimony.  The Tennessee Court of Criminal Appeals held:

> The petitioner's brother, Jeff Hall, died from complications of AIDS on July 4, 1995.  The petitioner claims that trial counsel were ineffective for failing to preserve his testimony.  It is undisputed that Mr. Ford and Mr. Mayo were not counsel of record at the time of Jeff Hall's death.  The record reflects that during the

guilt phase of the trial, counsel attempted to introduce
the affidavit [of Jeff Hall] through the testimony of
Sheryl Arbogast. <u>See</u> <u>Hall</u>, 8 S.W.3d at 603. The trial
court excluded the testimony because Ms. Arbogast had no
personal knowledge of the facts regarding her brother's
mental state. The issue was raised on direct appeal.
Both this court and the Tennessee Supreme Court affirmed
the trial court's exclusion of this statement. In
affirming the trial court's exclusion of the statement,
our supreme court reasoned:

Rule 804 provides for certain exceptions to the hearsay,
exclusionary rule when a witness is "unavailable."
"Unavailability" is defined at a subsection (a)(4) as
including situations in which the declarant "[i]s unable
to be present or to testify at the hearing because of the
declarant's death or then existing physical or mental
illness or infirmity." However, under a subsection (b)
of Rule 804, the hearsay exception for unavailable
witnesses applies only to (1) former testimony, (2)
statements under belief of impending death, (3)
statements against interest, and (4) statements of
personal and family history. <u>See</u> Tenn. R. Evid. 804(b).
Jeff Hall's descriptions to Arbogast of the defendant's
mental state do not fall within any of these exceptions.

<u>Id.</u> Mr. Ford and Mr. Mayo were not deficient in failing
to secure introduction of Jeff Hall's testimony.

Notwithstanding, the issue arises as to whether pretrial
counsel were ineffective for failing to interview or
preserve the testimony of Jeff Hall. Before his death,
Sheryl Arbogast traveled to Texas and obtained an
affidavit from him. In the affidavit, he said that the
petitioner had visited him in June 1994. During this
visit, he observed that the petitioner was "very
depressed/suicidal over family and money problems." The
affidavit reflects Mr. Hall's belief that the petitioner
loved his wife and children. He also believed that if
his brother was guilty of murder, the murder was "invoked
and induced by someone." He said that "Jon acted under
strong provocation, stress, pressure, and seemed to be
dysfunctional during his visit with me. . . ." Mr. Hall
closed by stating that his brother's attorneys had never
contacted him about testifying as a character witness.

The petitioner failed to call his former attorneys as
witnesses during the post-conviction evidentiary hearing.

100

As such, he has failed to satisfy his burden of proving
his allegation by clear and convincing evidence. Neither
the trial court nor this court have any way of knowing
the circumstances relevant to the issue and former
counsel or whether a tactical reason existed to withhold
this information from the jury absent testimony from
pretrial counsel. The petitioner is not entitled to
relief on this claim.

Hall, 2005 WL 22951, at **29-30.

Hall argues that his lawyers' failure to preserve and present evidence regarding Petitioner's family's efforts to have him committed just prior to the homicide was inexcusable. (D.E. 100 at 115.) He insists that this lapse was crucial to the sole issue at trial -- Petitioner's mens rea. (Id.) Petitioner also claims that trial counsel mistakenly believed that this testimony, which was admissible hearsay, was not admissible at sentencing. (Id. at 115-16.)

This is "a run-of-the-mill state-court decision applying the correct legal rule" from Strickland to the facts of Petitioner's case and, therefore, it does not "fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406. Petitioner disagrees with the state-court decision, however, he does not analyze the particular deficiencies in that decision in light of Strickland. He makes no effort to demonstrate that the state-court decision is objectively unreasonable, rather than merely incorrect. Id. at 410. His argument focuses solely on the fact that the evidence was crucial to mens rea and admissible at sentencing. However, he has not shown that he was prejudiced by

failure to preserve this evidence, especially in light of Dr. Zager's testimony that Petitioner was in a depressed and intoxicated mental state at the time of the murder (D.E. 21, Add. 2, Vol. 3, p. 333-35, 337-38, 342) and that he was suffering from psycho-social stressors because of his daughter's and brother's health issues, as well as domestic and financial problems (id. at 334-35; id. at Vol. 4, p. 404).  The Tennessee Court of Criminal Appeals' decision was neither contrary to nor an unreasonable application of clearly established federal law and was based on a reasonable determination of the facts in light of the evidence presented.

4.    Failed to present evidence of Hall's habit of
      disconnecting telephone wires

During the post-conviction proceedings, Petitioner alleged that his counsel was ineffective for failing to present evidence that "it was common for Petitioner to disconnect the phone lines to a home just to get the undivided attention of someone to talk to" and that it was not a "sinister" act.  (D.E. 21, Add. 8, Vol. 1, p. 27.)  In his habeas petition, Petitioner maintained that his counsel did not establish that he disconnected the telephone lines to Billie's house so she wouldn't call the police and inform them that he was violating a protection order.  (D.E. 15 at ¶ 262.9.)

The Tennessee Court of Criminal Appeals found on this issue as follows:

At the post-conviction hearing, the petitioner maintained that the act of disconnecting telephone lines, by itself, appeared sinister. He presented testimony that it was common for him to disconnect telephone lines in order to obtain the undivided attention of the person he was confronting. The petitioner maintained that none of the prior incidents where he disconnected telephone lines resulted in him inflicting harm. His position at the post-conviction hearing was that introduction of these prior incidents would have taken away the "sting" of the wires being disconnected and would have negated premeditation. He maintains that trial counsel were ineffective for failing to introduce evidence establishing that it was the petitioner's habit to disconnect telephone lines.

At the post-conviction hearing, trial counsel disagreed with the petitioner's theory on his habit of disconnecting telephone lines. Mr. Mayo testified that the act of disconnecting telephone lines to a house, no matter for what purpose, "paints a picture of someone who is on the edge." While he agreed that the act of disconnecting the wires appeared sinister, he believed that it looked sinister whether or not someone was harmed. He said that he could not conclude that this information would have been helpful to the petitioner. Mr. Ford testified that counsel was aware of the petitioner's practice of disconnecting telephone lines because it was contained in Carroll County police reports. Mr. Ford testified that evidence of a habit of disconnecting telephone lines established that the petitioner wanted to control situations and planned to do the same again. He disagreed with the position that this evidence would have negated premeditation.

The trial transcript reflects that during cross-examination of Chris Dutton, trial counsel elicited the fact that the petitioner had explained that he had disconnected the telephone line on previous occasions to prevent the victim from calling the police. See Hall, 8 S.W.3d at 598. Thus, information was conveyed to the jury that the petitioner had previously disconnected telephone lines with no harm resulting to the person he was confronting. We conclude, as did the trial court, that trial counsel was not deficient for failing to introduce multiple instances showing the petitioner's habit of disconnecting telephone lines. See Hellard, 629

> S.W.2d at 9. The petitioner is not entitled to relief on
> this claim.

Hall, 2005 WL 22951, at **30-31.

The state court credited Mr. Mayo's testimony that the fact
that Petitioner had cut the phone wires before "doesn't change
things very much" when you look at everything that happened that
day. (D.E. 21, Add. 7, Vol. 3, p. 307.) Mr. Ford testified, that
they knew Petitioner cut the phone line, and that "If you're
sitting in that jury box it surely is [a sinister thing]." (Id. at
398-400.) Ford stated, "If he disconnected the phone line, that
goes to premeditation, goes to planning." (Id. at 400.) He felt
that the disconnection of the phone lines was "very sinister" and
"just perfect for the prosecutor." (Id.) Ford stated,

> No. I don't' think you can say that that's a habit
> or custom when -- and convince a jury that he's got a
> habit of cutting phone lines to get people's attention
> when he has killed his wife. That just doesn't -- That's
> not going to fly. A jury's not going to buy that.
>
> . . .
>
> I see it goes to the exact opposite. It goes to his
> wanting to control the situation and have, just like you
> said, complete control and be one-on-one with them where
> there can be no other interference. It tells me that
> he's planned to do something.

(Id. at 401-02.) The decision not to present evidence of
Petitioner disconnecting phone lines in other circumstances was
based upon a reasonable trial strategy, and the state court's
decision was a reasonable application of Strickland. The Tennessee
Court of Criminal Appeals' decision was neither contrary to nor an

unreasonable application of clearly established federal law and was based on a reasonable determination of the facts in light of the evidence presented.

    5.  <u>Failed to present the mental health issue properly</u>

During the post-conviction proceedings, Hall alleged that his counsel was ineffective for not obtaining a competent psychiatrist to evaluate Petitioner and failure to collect a complete social history for mitigation purposes. (D.E. 21, Add. 8, Vol. 1, pp. 27-29.) The Tennessee Court of Criminal Appeals set forth the factual background for this claim:

> During the guilt phase of the petitioner's trial, trial counsel presented the testimony of Dr. Lynn Zager, a clinical psychologist. <u>See</u> <u>Hall</u>, 8 S.W.3d at 598. Dr. Zager diagnosed the petitioner as depressed and suffering from alcohol dependence. She further observed "personality characteristics of paranoia and dependency." In her professional opinion, she believed that the petitioner suffered from depression and alcohol intoxication at the time of the killing. She found these factors were compounded by his personality characteristics and various psycho-social stressors, including a sick child, loss of employment with the resulting financial problems, his impending divorce, and the terminal illness of a brother. She concluded that the petitioner acted in an impulsive manner in killing his wife, rather than pursuant to a preconceived plan.
>
> Dr. Zager testified again during the penalty phase along with Dr. Joe Mount, a psychological examiner who counseled the petitioner at Riverbend Maximum Security Institution. <u>Hall</u>, 8 S.W.3d at 598. Both doctors described him as "depressed, remorseful, suicidal and extremely concerned about his children." Dr. Mount testified that the petitioner had been diagnosed as suffering from an adjustment disorder with mixed emotional features and "substance abuse of dependence by history." <u>Id.</u> at 599.

At the post-conviction evidentiary hearing, the petitioner presented the testimony of Dr. Pamela Auble and Dr. Keith Caruso, who examined the petitioner at the request of post-conviction counsel. Both doctors testified that a complete social history, including interviews with more than one family member, was necessary in order to competently evaluate a client.

Dr. Auble's evaluation of the petitioner resulted in several conclusions: (1) certain results were consistent with attention deficit disorder, (2) results indicated the petitioner has difficulty controlling emotions in emotional situations, (3) the petitioner exhibited low self-esteem, (4) evidence of internal anger existed, (5) the petitioner may have had trouble understanding people and perceiving them in accurate ways, and (6) evidence existed of tension from his current situation. Dr. Auble stated that a low serotonin level would be consistent with Intermittent Explosive Disorder. On cross-examination, Dr. Auble conceded that a diagnosis of Intermittent Explosive Disorder is made only after other mental disorders and alcohol or drug abuse are excluded. Alcohol abuse, drug abuse, and other mental disorders could not be excluded as the cause of the petitioner's aggressive behavior. She conceded that her conclusions were basically the same as those reached by Dr. Zager.

Dr. Caruso concluded that because of Intermittent Explosive Disorder, major depression, and intoxication, but mostly Intermittent Explosive Disorder the petitioner was unable to achieve a mental state absent of passion and excitement. He said that recent research by Dr. Emil Coccaro revealed a correlation between low levels of serotonin in the brain and violent acts. He stated that the petitioner's serotonin level is in the bottom five percent and is, therefore, consistent with someone having Intermittent Explosive Disorder. On cross-examination, Dr. Caruso conceded that Dr. Coccaro's findings relative to serotonin level and Intermittent Explosive Disorder were neither available in 1995 nor at the time of the trial because Dr. Coccaro's theory was not presented until 2001. He further conceded that this information is not contained in the current DSM4. Dr. Caruso agreed that the petitioner's act of disconnecting the telephone line established that he was capable of some degree of planning.

106

The state presented the testimony of Dr. Kimberly Stalford to rebut the conclusions of Dr. Auble and Dr. Caruso. Dr. Stalford defined Intermittent Explosive Disorder and stated that she did not diagnose the petitioner as having the disorder. She concluded that the petitioner's behavior was better explained with a diagnosis of passive/aggressive traits, dependant traits, and anti-social traits, including a reckless disregard for other people and agitated and potentially violent acts. She also diagnosed the petitioner with alcohol dependence.

Dr. Stalford discounted the correlation between low serotonin levels and Intermittent Explosive Disorder. Specifically, she said that a low serotonin level is not a useful diagnostic tool for three reasons: (1) many medical, neurological, and psychiatric conditions have been linked to altered serotoninergic levels so as to rebut the assertion that a low level of serotonin is undoubtedly linked only to Intermittent Explosive Disorder; (2) serotonin levels measured in the spinal fluid are not an accurate indication of the serotonin activity in the synapses which is where it works; and (3) much question exists as to what are "normal" levels of serotonin.

The petitioner contends that trial counsel was ineffective for failing to provide Dr. Zager with a complete mitigation history of the petitioner, which prohibited a complete evaluation of the petitioner's mental condition. Additionally, he asserts that counsel was ineffective for relying upon the evaluation of Dr. Zager, a psychologist, rather than obtaining the services of a psychiatrist.

Hall, 2005 WL 22951, at **31-32. The Tennessee Court of Criminal

Appeals then addressed the issue in two parts: 1) failure to

provide a complete mitigation history; and 2) failure to obtain the

services of a psychiatrist. The court ultimately held that

Petitioner was not entitled to relief for either aspect of his

ineffective assistance of counsel claim as it had framed the issue.

Id. at *34.

107

a.  Failure to prepare a complete mitigation history

In his post-conviction petition, Hall asserted that Mayo was the only attorney who spoke to any of his family, and that he only talked to Arbogast.  (D.E. 21, Add. 8, Vol. 1, p. 29.)  In his habeas petition, Petitioner alleged that his counsel failed to obtain and present evidence from his family and other sources respecting his social history.  (D.E. 15 at ¶ 259.)

Petitioner argues that had counsel conducted an adequate mitigation investigation and submitted a complete social history to Dr. Zager, this information could have been presented at the guilt stage to demonstrate that Hall was not capable of forming the intent required for first degree murder and at sentencing to mitigate a sentence of death.  (D.E. 100 at 89.)  He contends that even a cursory investigation would have revealed that he was born early with the umbilical cord around his neck, a malfunctioning liver, and a blood group incompatibility.  (Id. at 90.)  As an infant and toddler, Petitioner had problems with severe diarrhea.  (Id. at 91.)  His father and paternal grandfather both abused alcohol and were physically abusive.  (Id. at 93-95.)  The family also had financial problems (id. at 96-97) and there were arguments and violence in the family home (id. at 97-101).  Petitioner was abused by his older siblings and shunned by his father (id. at 102-05), had anger management issues as a child, and suffered from alcohol-related effects on his behavior as an adult (id. at 106).

On this point, the Tennessee Court of Criminal Appeals held:

*2. Failure to provide complete mitigation history*

In his brief, the petitioner makes several statements
regarding counsel's "duty to investigate thoroughly a
complete mitigation history of the client." However, he
fails to allege which portions of his social history were
not provided to Dr. Zager. At the post-conviction
hearing, three of the petitioner's sisters and several of
his friends testified that trial counsel failed to
interview them until the evening before their testimony.
It was established, however, that the petitioner had been
appointed investigators by the court. The petitioner did
not present the testimony of these investigators or his
pretrial attorneys at the post-conviction hearing.

The mitigation assessments and reports provided by Dr.
Ann Charvat and Gloria Shettles were introduced as part
of the post-conviction record. Dr. Charvat's assessment
contained summaries of her interviews with Sheryl
Arbogast and the petitioner's mother. Dr. Charvat
compiled a lengthy family history and her report also
contained a list of potential witnesses and detailed
guidance for the manner in which defense counsel should
prepare for a capital murder trial. Additionally, the
post-conviction record contains one memorandum completed
by Gloria Shettles, the mitigation specialist, showing
that both the petitioner and Sheryl Arbogast had reviewed
and made corrections to Dr. Charvat's initial assessment.
The memorandum also indicates that correspondence had
been forwarded to the petitioner's family for the purpose
of separate interviews and additional background
information. The memorandum reflects Gloria Shettles'
conclusion that the petitioner may have suffered from
Intermittent Explosive Disorder. The petitioner failed
to present the testimony of Ms. Shettles and failed to
provide the court with additional reports. The
petitioner has not established that Ms. Shettles did not
interview potential witnesses. Finally, there is
evidence that defense counsel was granted funds for a
private investigator, Tammy Askew. There is no evidence
before the court that Ms. Askew did or did not conduct
any investigation.

Trial counsel testified that Dr. Zager was provided all
of the relevant information that they possessed. The
record does contain a letter written on November 19,

109

> 1995, by Dr. Zager to one of the petitioner's pretrial
> attorneys, which stated her need for more information
> before she would be able to deliver a definitive
> assessment of the petitioner. Specifically, she inquired
> as to interviews with Randy Helms, Jackie and Darlene
> Brittain, the petitioner's mother, Debbie Davis, Sheryl
> Arbogast, and Jeff Hall. The letter closed by stating,
> "I will provide a complete report once the above
> information is received and reviewed in light of the
> evaluation." The petitioner failed to call Dr. Zager as
> a witness at the post-conviction hearing. We can presume
> from the fact that she testified as to the petitioner's
> mental condition at trial that she was provided
> sufficient information for a complete report. The
> petitioner has failed to establish that Dr. Zager was not
> provided all relevant information. Counsel cannot be
> found deficient when they complete an adequate
> investigation.

Hall, 2005 WL 22951, at **32-33.

Hall's mother and three sisters have testified about the alcoholism, physical and psychological abuse that he experienced as a child and the fact that his father mistreated him because he did not believe Petitioner was his son. The evidence that Petitioner contends could have been obtained from a more complete social history may provide more detail, but it would have been repetitive of what was already presented. To the extent that counsel may have been deficient in obtaining a social history, Petitioner was not prejudiced. The Tennessee Court of Criminal Appeals' decision was neither contrary to nor an unreasonable application of clearly established federal law and was based on a reasonable determination of the facts in light of the evidence presented.

b. Failure to obtain services of a psychiatrist

In his habeas petition, Petitioner recharacterizes this claim as counsel failed to obtain and present evidence that "at the time of the offense, a biologically driven deficit . . . interfered with Mr. Hall's ability to exercise reflection and judgment for his actions." (D.E. 15 at ¶ 261.)

The Tennessee Court of Criminal Appeals held as follows on this issue:

*3. Failure to obtain services of a psychiatrist*

The petitioner complains that trial counsel were ineffective for failing to seek the services of a psychiatrist. The petitioner was provided the services of Dr. Zager, a clinical psychologist. The evidence does not indicate whether Dr. Zager had Gloria Shettles' report mentioning Intermittent Explosive Disorder available to her. Evidence at the post-conviction hearing reflected that Ms. Shettles discussed the possibility of the petitioner's suffering from Intermittent Explosive Disorder with Sheryl Arbogast. Ms. Arbogast apparently agreed with Ms. Shettles' assessment. However, neither Ms. Shettles nor Ms. Arbogast [was] qualified to provide a diagnosis as to the petitioner's mental condition, and Dr. Zager was not bound to adopt their opinions. Dr. Zager's qualifications as a clinical psychologist are not disputed, and there is noting indicating that Dr. Zager's diagnosis would have changed had she been provided additional information. Accordingly, we believe that the only complaint concerning Dr. Zager's diagnosis is that it is not the diagnosis now desired by the petitioner. In effect, the petitioner is contending that trial counsel were deficient for failing to present evidence of Intermittent Explosive Disorder.

Nothing in the record indicates that Dr. Zager did not consider the possibility that the petitioner suffered from Intermittent Explosive Disorder. Additionally, had Dr. Zager believed that a serotonin test was necessary, she could have informed trial counsel that she did not have the authority to order such a test and that a psychiatrist should be contacted to conduct further

evaluations. Dr. Zager did not make any such indication to trial counsel. Additionally, the petitioner has failed to present any evidence establishing that trial counsel should not have relied upon Dr. Zager's professional opinion.

Dr. Zager did not diagnose the petitioner with Intermittent Explosive Disorder. The Middle Tennessee Mental Health Institute team, which included a psychiatrist, did not diagnose the petitioner with Intermittent Explosive Disorder. Finally, the state's post-conviction psychiatrist did not diagnose the petitioner with the disorder. Thus, the petitioner's claim, at best, amounts to an assertion that counsel should have obtained an expert who would have diagnosed the petitioner with Intermittent Explosive Disorder. The Constitution does not require attorneys to "shop around" for more favorable expert testimony. See Panner v. Murray, 964 F.2d 1404, 1419 (4th Cir. 1992).

Although the petitioner has now presented the testimony of two experts to support his theory of Intermittent Explosive Disorder, he still has not established that counsel was deficient for failing to present such testimony at trial. Dr. Caruso conceded that research relative to the correlation of low serotonin levels and Intermittent Explosive Disorder was unavailable at the time of the petitioner's trial. Additionally, the trial court determined that the testimony of both Dr. Auble and Dr. Caruso was effectively impeached through cross-examination of these witnesses and by the testimony of Dr. Stalford. The petitioner has failed to establish that trial counsel should have presented evidence of Intermittent Explosive Disorder. He is not entitled to relief on this claim.

Hall, 2005 WL 22951, at **33-34.

Hall contends that the failure to present additional evidence of his mental health, which "unquestionably establishes" that he, as a result of brain damage and intoxication, did not deliberate and premeditate Billie's murder is ineffective assistance of counsel. (D.E. 100 at 74.) Petitioner asserts that he lacked the

ability to control his behavior and control and regulate his emotions because of the brain damage. (Id. at 76.) He also claims that due to the combination of brain damage and intoxication, he is "less likely than normal persons to act in a deliberate fashion, with a cool purpose, or to exercise normal reflection and judgment," and thus can only be guilty of second-degree murder. (D.E. 100 at 81-82.) Petitioner asserts that counsel did not effectively investigate the mens rea defense because counsel did not present evidence of Hall's brain damage and resulting mental health problems. (Id. at 83.)

In support of his habeas petition, the inmate presented a summary from Dr. Ruben Gur, the Director of Neuropsychology at the University of Pennsylvania, who, in February 2008, performed a quantitative analysis of magnetic resonance imaging (MRI) and positron emission tomograph (PET) studies of Petitioner. (D.E. 102-35 at 13-18.) Dr. Gur found that Petitioner's "brain revealed abnormalities in frontal, limbic and associated regions relevant to behavior, especially related to the interpretation of emotionally relevant information and regulation of response." (Id. at 15-16.) Dr. Gur noted that Petitioner's abnormalities may have been related to traumatic brain injury, but some of the abnormalities indicate that Petitioner was "neurodevelopmentally compromised," specifically the large ventricles which are strongly associated with neurodevelopmental disorders such as schizophrenia. (Id. at

16.)  Dr. Gur further stated that his analysis was based on data, and he would need to review medical, school and offense records and interview and test Petitioner to make a diagnosis.  (Id. at 16.)

Petitioner also presented the declaration of Dr. J. Douglas Bremner, professor of Psychiatry and Behavioral Sciences at Emory University School of Medicine, in support of his habeas petition. (See D.E. 102-37 through -39.)  Dr. Bremner stated, "The fact that he (Petitioner) had been drinking was an additional factor, added onto his abnormal brain function, that would contribute to his inability to properly regulate emotion, as well as to think properly and act in a logical and deliberate manner." (D.E. 102-39 at 4.)  Dr. Bremner concluded that, based on the traumatic stress, abuse and neglect Petitioner experienced and the documented alterations in his brain, Petitioner "would be less likely than normal persons to act in a deliberate fashion, with a cool purpose, or to exercise normal reflection and judgment." (Id. at 6.)  In summary, Dr. Bremner found:

> It is my opinion that in the case of Jon Hall there are
> a number of factors that go against the conclusion that
> he committed murder in the first-degree, i.e.[,] coolly
> planned, deliberate, intentional, and with cool purpose,
> and after reflection, judgment and planning.  Brain and
> neuropsychological testing by Dr. Gur show abnormalities
> in brain areas involved in the regulation of thinking,
> emotion and behavior, which would impair his ability to
> think in a cool and deliberate fashion, and to adequately
> use reflection and judgment to plan and execute a pre-
> meditated murder.  Severe childhood abuse and neglect
> affected his neurodevelopment, leading to changes in
> brain regions involved in mood and emotion including
> frontal cortex, amygdala, hippocampus and corpus

114

callosum. These findings are consistent with a wide
range of evidence from both animal and human studies of
the effects of traumatic stress and early neglect on the
brain, showing that trauma affects brain areas involved
in regulation of emotion, thinking, and deliberate
planning. The evidence presented is not consistent with
a planned, intentional and calculated pattern of behavior
involving a premeditated plan to kill his wife. For
instance, children's statements that there was a period
of calm discussion before violent argument, that he
brought a money order for his wife, that he wanted to be
reconciled with his wife, etc., are not consistent with
coolly planned, intentional murder executed after calm
reflection. He also had strong affections for his
children that would not lead him to purposively kill
their mother. These findings, in additional to the
circumstances related to abnormalities of the brain, and
the effect of alcohol intoxication, show that he did not
act in a deliberate, coolly planned, and intentional way,
or after planning and reflection, in order to kill his
wife. Early trauma has been associated with changes in
function and structure of brain areas including frontal
cortex, amygdala and hippocampus, that were shown to be
abnormal in Mr. Hall and that play an important role in
violence, emotion, aggression and behavioral control.

Id. at 9.

Petitioner relies on Jacobs v. Horn, 395 F.3d 92 (3d Cir.),

cert. denied sub nom. Jacobs v. Beard, 546 U.S. 962 (2005) and

Frazier v. Huffman, 343 F.3d 780 (6th Cir. 2003), cert. denied, 541

U.S. 1095 (2004) to demonstrate that he is entitled to relief for

his counsel's failure to obtain and present evidence of his brain

damage and resulting mental health issues. (D.E. 100 at 84-87.)

However, Hall's case differs from both Jacobs and Frazier because,

unlike the counsel in those cases, his counsel presented evidence

through Dr. Zager that Petitioner suffered from depression and

alcohol dependence, had personality characteristics of paranoia and

dependence, suffered psycho-social stressors, and acted in "an impulsive manner versus a well-thought out plan." (D.E. 21, Add. 2, Vol. 3, p. 333-35.) Dr. Zager's diagnosis of Petitioner is consistent with the conclusions of Drs. Gur and Bremner. Neither Dr. Gur nor Dr. Bremner diagnosed Petitioner with a particular mental illness, but they explained how the physical structure of his brain may have affected his behavior. Ultimately, their opinion was no different from Dr. Zager's that the inmate could not form the specific intent to commit first degree murder and that he acted in an impulsive manner. Even if counsel were found deficient because he did not investigate and present evidence of brain damage, Petitioner was not prejudiced.

He has not demonstrated that the Tennessee Court of Criminal Appeals' opinion was contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts. Petitioner's claim is without merit.

6. <u>Failed to present evidence that Petitioner was a good father and of other good acts</u>

In his post-conviction petition, Petitioner asserted that counsel could have obtained valuable testimony from the Stanfields, Brittains and Foremans. (D.E. 21, Add. 8, Vol. 1, at 30.) In his habeas petition, Petitioner alleges that his counsel failed to

116

obtain and present evidence from Jackie Brittain, Darlene Brittain and Valene McKinney Foreman. (D.E. 15 at ¶ 260.)[32]

The Tennessee Court of Criminal Appeals held on this claim:

The petitioner asserts that he has presented "massive amounts of 'good guy' and 'good father' evidence" during the post-conviction evidentiary hearing. The record reflects that he presented the testimony of (1) Sheryl Arbogast and Kathy Hugo, the petitioner's sisters, who could have testified to his aptitude as a father, (2) Clarence Stanfill, Joe Henry Stanfill, Valene Foreman, Paula Foreman, and Pamela Foreman who could have testified to the petitioner's ability to care for his children, and (3) Jackie and Darlene Brittain who could have testified to good acts performed by the petitioner. He contends that trial counsel were deficient for failing to investigate and interview favorable witnesses and for failing to introduce their testimony at trial.

In the context of capital cases, a defendant's background, character, and mental condition are unquestionably significant. "[E]vidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." California v. Brown, 479 U.S. 538, 545, 107 S. Ct. 837, 841, 93 L. Ed. 2d 934 (1987); see Eddings v. Oklahoma, 455 U.S. 104, 113-15, 102 S. Ct. 869, 876-77, 71 L. Ed. 2d 1 (1982); Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978) (plurality opinion); Zagorski v. State, 983 S.W.2d 654, 657-58 (Tenn. 1998); Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). The right that capital defendants have to present a vast array of personal information in mitigation at the sentencing phase, however, is constitutionally distinct from the question whether counsel's choice of information to present to the jury was professionally reasonable.

There is no constitutional imperative that counsel must offer mitigation evidence at the penalty phase of a

---

[32]Petitioner references a "Vic Stanfield" in his habeas petition, but it is unclear whether he is one of the Stanfields involved in the post-conviction proceedings.

capital trial. Nonetheless, the basic concerns of
counsel during a capital sentencing proceeding are to
neutralize the aggravating circumstances advanced by the
state and to present mitigating evidence on behalf of the
defendant. Although there is no requirement to present
mitigating evidence, counsel does have the duty to
investigate and prepare for both the guilt and the
penalty phase. See Goad, 938 S.W.2d at 369-70.

To determine whether trial counsel was ineffective for
failing to present mitigating evidence, the reviewing
court must consider several factors. First, the
reviewing court must analyze the nature and extent of the
mitigating evidence that was available but not presented.
Goad, 938 S.W.2d at 371 (citing Deutscher v. Whitley, 946
F.2d 1443 (9th Cir. 1991); Stephens v. Kemp, 846 F.2d 642
(11th Cir. 1988); State v. Adkins, 911 S.W.2d 334 (Tenn.
Crim. App. 1994); Cooper v. State, 847 S.W.2d 521, 532
(Tenn. Crim. App. 1992)). Second, the court must
determine whether substantially similar mitigating
evidence was presented to the jury in either the guilt or
penalty phase of the proceedings. Id. (citing Atkins v.
Singletary, 965 F.2d 952 (11th Cir. 1992), cert. denied,
515 U.S. 1165, 115 S. Ct. 2624, 132 L. Ed. 2d 865 (1995);
Clozza v. Murray, 913 F.2d 1092 (4th Cir. 1990), cert.
denied, 499 U.S. 913, 111 S. Ct. 1123, 113 L. Ed. 2d 231
(1991); Melson, 722 S.W.2d at 421)). Third, the court
must consider whether there was such strong evidence of
applicable aggravating factors that the mitigating
evidence would not have affected the jury's
determination. Id. (citing Fitzgerald v. Thompson, 943
F.2d 463, 470 (4th Cir. 1991), cert. denied, 502 U.S.
1112, 112 S. Ct. 1219, 117 L. Ed. 2d 456 (1992); Elledge
v. Dugger, 823 F.2d 1439 (11th Cir. 1987), cert. denied,
485 U.S. 1014, 108 S. Ct. 1487, 99 L. Ed. 2d 715 (1988)).

Trial counsel developed a mitigation theory that was
supported by both expert and lay witnesses. During the
penalty phase of the petitioner's trial, Dr. Zager
testified that the petitioner's children "meant
everything" to the petitioner. She stated that he was
the children's primary caretaker and that he was very
protective of them. Dr. Zager recognized the
relationship the petitioner shared with his daughter who
suffered from cerebral palsy. Dr. Joe Mount testified
that the petitioner was extremely concerned about his
children. He expressed his opinion that the petitioner
cared a great deal for his children. Dr. Mount also

118

acknowledged the petitioner's concerns about his daughter
who suffered from cerebral palsy. Randy Helms, the
petitioner's former employer, described the petitioner as
a good, dependable employee and conveyed how he had cared
for his children. He affirmed the petitioner's love for
his wife and children. The petitioner's sister, Debbie
Davis, described him as "a wonderful person at home, very
helpful. He would help anybody do anything." Ms. Davis
testified that the petitioner "just adored the children,"
noting that "[h]e was a wonderful daddy. He was just
absolutely wonderful." She stated, "He played with all
of them. . . . He loved them equally. He loved them
all." Finally, the petitioner's mother stated that he
took care of his children and loved them all. She also
related how the petitioner took special care of his
daughter with cerebral palsy.

In addition to this testimony, defense counsel elicited
favorable character information during cross-examination
of several of the state's witnesses. Chris Dutton
testified that the petitioner was concerned about his
children, especially his daughter with cerebral palsy.
During the examination of TBI Agent Byrd, defense counsel
elicited testimony that the petitioner expressed remorse
over causing his wife's death.

The petitioner presented seven witnesses during the
penalty phase of the trial. Contrary to the petitioner's
assertions, trial counsel did introduce evidence to rebut
the state's portrayal of him as a "monster." At the
post-conviction hearing, the petitioner maintained that
trial counsel did not adequately explore potential
mitigation witnesses and he presented numerous witnesses
to demonstrate the type of mitigating evidence which he
believed should have been presented during the penalty
phase. These witnesses testified regarding their
perceptions of the petitioner as a father and a person.
These witnesses were cumulative and expounded upon
testimony presented by the seven witnesses presented at
the penalty phase. In this regard, we conclude that
trial counsel identified and presented testimony
supporting the relevant mitigating themes. The only
question is whether trial counsel should have introduced
more mitigating evidence. We cannot conclude that a
reasonable probability exists that more testimony of this
nature would have led the jury to conclude that the
"balance of aggravating and mitigating circumstances did
not warrant death." Nichols, 90 S.W.3d at 602.

119

Additionally, we conclude that trial counsel
strategically elected not to present the testimony of
several witnesses.  With regard to the testimony of
Jackie and Darlene Brittain, we agree with trial
counsel's assessment that any valuable testimony that
they could have provided for the petitioner was
outweighed by the danger of the state cross-examining
these witnesses as to prior threats made by the
petitioner against the victim, including that he "was
going to grind his wife up into hamburger meat."  We also
question the importance of several witnesses, i.e.,
Valene Foreman, Pamela Foreman, and Paula Foreman, who
indicated from their testimony that they did not know the
petitioner very well.  Additionally, some of their
testimony contradicted the petitioner's claim that he
always cared for the children when the victim was at work
or at school.  Again, the petitioner has failed to
establish that counsel's performance was deficient.

Finally, with regard to the claims of post-conviction
witnesses that trial counsel failed to contact them
regarding their potential testimony, we again refer to
the fact that the defense team consisted of three
investigators.  None of these investigators were called
to testify at the post-conviction hearing.  There is
evidence that defense counsel was aware of these
potential witnesses.  For instance, Darlene Brittain
testified that trial counsel informed her that they would
not call her as a witness because of the petitioner's
"hamburger" statement; Jackie Brittain stated that the
state had subpoenaed him as a witness as he had provided
information that the petitioner had made threats against
the victim.  He conceded that trial counsel had talked
with him at the courthouse.  The petitioner has failed to
establish that he is entitled to relief on this claim.

Hall, 2005 WL 22951, at **34-37.

Petitioner makes no effort to demonstrate why he is entitled

to habeas relief on this claim.  The Tennessee Court of Criminal

Appeals' decision was neither contrary to nor an unreasonable

application of clearly established federal law and was based on a

reasonable determination of the facts in light of the evidence presented.

7. <u>Failed to present a theory of defense</u>

In the post-conviction proceedings, Hall asserts that his trial counsel failed to properly present an intoxication defense. (D.E. 21, Add. 8, Vol. 1, p. 26.) Petitioner argued that his counsel did not produce "one shred of evidence" regarding intoxication. (<u>Id.</u> at 26-27.) In his habeas petition, Petitioner asserts that prior to his trial, Mayo did not think that voluntary intoxication was a defense to first degree murder. (D.E. 15 at ¶ 204.) Ford believed that Petitioner had five or six beers before the incident and decided to present voluntary intoxication as a defense at the guilt stage. (<u>Id.</u> at ¶ 205.) Petitioner alleges that counsel failed to obtain and present evidence that he consumed numerous beers, smoked marijuana and ingested Stay Alert pills prior to the homicide to demonstrate the severity of his intoxication on that night. (<u>Id.</u> at ¶ 260.6.)

The Tennessee Court of Criminal Appeals held:

The petitioner asserts that trial counsel failed to develop and present a theory of defense. Specifically, he complains that trial counsel failed to present evidence of intoxication, evidence that the murder was the result of a continuing domestic dispute, or any other evidence favorable to the petitioner. The petitioner's allegation is not supported by either the record of the post-conviction hearing or the record of the petitioner's trial. Mr. Ford testified that the defense relied upon a theory that the petitioner was acting in an impulsive manner. Trial counsel attempted to convince the jury that the petitioner was distraught, depressed, and

intoxicated. Trial counsel argued that the petitioner's behavior reflected an impulsive act as opposed to a planned act. Counsel asserted that the state had failed to meet its burden of proving premeditation and deliberation beyond a reasonable doubt. During opening argument, trial counsel focused on the petitioner's domestic problems with the victim, suggested that the petitioner went to the victim's residence hoping for a reconciliation, and emphasized the fact that the petitioner did not take a weapon with him. Counsel supported this position throughout their examination of the witnesses. These theories continued throughout the penalty phase. The petitioner's claims are clearly not supported by the record. The petitioner has not presented any other evidence that the defense was not adequate. Therefore, the petitioner has not met the requirements to be granted post-conviction relief on this claim.

Hall, 2005 WL 22951, at *37.

Hall focuses on intoxication as it relates to whether the trial court's jury instruction on intoxication violated his constitutional rights. (See D.E. 100 at 3-6.). He did not address whether counsel was ineffective in developing a theory of a defense based on intoxication. Petitioner makes no effort to establish that the state-court decision is objectively unreasonable, rather than merely incorrect. Williams, 529 U.S. at 410. Petitioner concedes that counsel presented sufficient evidence to support the intoxication argument. He states, "In fact, the evidence of intoxication was so substantial that in closing argument, the State attempted to minimize and obscure the importance of intoxication evidence to the jury's charge." (D.E. 100 at 22 n.3.) The Tennessee Court of Criminal Appeals' decision was neither contrary to nor an unreasonable application of clearly established federal

122

law and was based on a reasonable determination of the facts in light of the evidence presented.

8.   Remaining Ineffective Assistance of Counsel Claims

Petitioner's claims in his habeas petition, to the extent that they have not been addressed above, are procedurally defaulted because Petitioner failed to exhaust these claims and failed to demonstrate cause and prejudice or that a miscarriage of justice would result if the Court fails to review these claims.

Claim 13 is DENIED.

N.   Actual Innocence (Claim 14)

Hall alleges that he is actually innocent of intentional, deliberate, premeditated first degree murder because he lacked the requisite mental state.   (D.E. 15 at 61.)   "A claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Herrera v. Collins, 506 U.S. 390, 404 (1993) (internal citation and quotation marks omitted).   The actual innocence exception is very narrow in scope and requires proof of factual innocence, not just legal insufficiency. Bousley v. United States, 523 U.S. 614, 623 ("It is important to note . . . that 'actual innocence' means factual innocence, not mere legal insufficiency").   Herrera noted that "a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant

unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." <u>Herrera</u>, 506 U.S. at 417; <u>Wright v. Stegall</u>, 247 F.App'x 709, 711-12 (6th Cir. 2007). The threshold showing for such a right would "necessarily be extraordinarily high." <u>Wright</u>, 247 F.App'x at 712 (internal citation and quotation marks omitted). In <u>House v. Bell</u>, 547 U.S. 518, 554-55 (2006), the Supreme Court declined the opportunity to resolve the issue that freestanding innocence claims in death penalty cases are possible. Petitioner has not demonstrated a basis for habeas relief.

Claim 14 is DENIED.

O.   <u>Violation of International Law (Claim 15)</u>

Petitioner claims that his conviction and sentence violate Article 6, Section 2 of the United States Constitution because the State disregarded his rights under international law. (D.E. 15 at 61-66.) Petitioner argues that his rights under various treaties ratified by the United States, entered into and signed by the President of the United States, and his rights under customary international law have been violated. (<u>Id.</u>) Respondent asserts that this claim was never presented in the Tennessee state courts and is barred by procedural default. (D.E. 90-1 at 43.) As this issue was not raised in the state court proceedings, and Petitioner has not presented an excuse for not doing so, the claim is procedurally defaulted.

124

CLAIM 15 is DENIED.

P.    Proportionality Review (Claim 16)

Hall argues that his Sixth, Eighth and Fourteenth Amendment
rights were violated because the Tennessee appellate courts relied
on a Rule 12 form which was not filled out in its entirety and
contained inaccurate information.   (D.E. 15 at 46-47, 66.)   The
Supreme Court has held that the Constitution only requires
proportionality between the punishment and the crime, not between
the punishment in this case and that exacted in other cases.
Pulley v. Harris, 465 U.S. 37, 42-44 (1984) (Traditionally,
"proportionality" refers to an "abstract evaluation of the
appropriateness of a sentence for a particular crime."  The Eighth
Amendment does not require a state appellate court to conduct a
proportionality review which involves comparing the sentence in the
case before it with penalties imposed in similar cases.).  "There
is no constitutional requirement that a state appellate court
conduct a comparative proportionality review."  Id. at 49-50.  The
Supreme Court has generally rejected claims that a petitioner's
death sentence is disproportionate to the sentences received by
individuals convicted of similar crimes.  See, e.g., McCleskey v.
Kemp, 481 U.S. 279 (1987) (rejecting Equal Protection and Eighth
Amendment claims challenging racially disproportionate imposition
of capital punishment); Gregg, 428 U.S. at 199 (rejecting claim
that discretionary decision made with respect to the imposition of

capital punishment, including the fact that "the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them," violates the Eighth Amendment); <u>see also</u> <u>Pulley</u>, 465 U.S. at 42-44 (the Eighth Amendment does not require judicial proportionality review).  "Since proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for comparison"; therefore "limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed" falls within this wide latitude.  <u>Williams v. Bagley</u>, 380 F.3d 932, 962-63 (6th Cir. 2004), <u>cert. denied sub nom.</u> <u>Williams v. Bradshaw</u>, 544 U.S. 1003 (2005) (citing seven prior Sixth Circuit cases upholding Ohio's limited proportionality review against constitutional challenges). In <u>Coe</u>, the Sixth Circuit held that the Tennessee mandatory death-penalty review statute did not create a liberty interest or a due process right.  <u>Coe</u>, 161 F.3d at 351-52.  No constitutional right was violated by the proportionality review.

Claim 16 is DENIED.

Q.   <u>Incompetence for Execution (Claim 17)</u>

Petitioner alleges he will not comprehend the punishment he is about to receive or the reason for that punishment at the time of his execution.  (D.E. 15 at 66-67.)  In <u>Panetti v. Quarterman</u>, 551 U.S. 930, 947 (2007), the Supreme Court held that a petitioner's

claim of incompetency to be executed because of his mental
condition, based on <u>Ford v. Wainwright</u>, 477 U.S. 399 (1986), is not
one that is required to be brought in an initial habeas petition on
pain of being treated as a second or successive petition.  <u>See</u>
<u>Tompkins v. Sec'y, Dep't of Corr.</u>, 557 F.3d 1257, 1259 (11th Cir.
2009), <u>cert. denied sub nom.</u> <u>Tompkins v. McNeil</u>, 129 S. Ct. 1305
(2009) (Generally , a <u>Ford</u> claim does not become ripe until after
the time has run to file the first federal habeas petition).  The
setting of an execution date, which causes a <u>Ford</u> incompetency
claim to become ripe, has not occurred in this case.  <u>Panetti</u>, 551
U.S. at 942-43.[33]

Claim 17 is DENIED.

R.   <u>Death by lethal injection and/or electrocution
     constitutes cruel and unusual punishment (Claim 18)</u>

The inmate claims that electrocution and lethal injection
constitute cruel and unusual punishment and violate the Sixth,
Eighth and Fourteenth Amendments.  (D.E. 15 at 67-73.)  Respondent
contends that these claims were never raised in the Tennessee
courts and are now barred from federal review due to procedural
default.  (D.E. 90-1 at 45.)  Petitioner does not address the
procedural default of this claim.[34]  As Petitioner has not presented

---

[33]Both parties acknowledge that this claim is not ripe for the Court's
consideration.  (<u>See</u> D.E. 90-1 at 44-45; D.E. 100 at 157-58.)

[34]Instead, Petitioner argues that the claim is cognizable because <u>Hill v.
McDonough</u>, 547 U.S. 573 (2006) allowed a § 1983 claim related to the execution
protocol and "did not, however, hold that an inmate *must* bring his claim under
§ 1983 rather than in a habeas action pursuant to 28 U.S.C. § 2254."  (D.E. 100
at 143) (emphasis added).  In <u>Hill</u>, the Supreme Court determined that method-of-

an excuse for his failure to exhaust this claim, the claim is barred by procedural default.

Claim 18 is DENIED.

S.   Petitioner's death sentence violates his fundamental right to life. (Claim 19)

Hall asserts that by offering a life sentence, the State demonstrated that there were less restrictive means than the death sentence to effectuate its interests in punishing Petitioner. (D.E. 15 at 73.) He also avers that by seeking a death sentence, the State unconstitutionally burdened his trial right. (Id.)

The post-conviction court held that Petitioner waived issues regarding the constitutionality of the conviction and death sentence by not raising them on direct appeal. (D.E. 21, Add. 6, Vol. 7, p. 1011.) The Tennessee Court of Criminal Appeals agreed that these issues were waived, and specifically held:

> The petitioner challenges the constitutionality of Tennessee's death penalty statutes, contending that (1) the heinous, atrocious, or cruel aggravating factor is unconstitutionally vague and overbroad; (2) the sentence of death cannot be fairly imposed and administered; and (3) the sentence of death unconstitutionally infringes upon the petitioner's right to life. The trial court rejected these claims, finding them previously determined, waived, or not supported with evidence. The trial court also determined that the claims raised by the

---

execution claims are appropriately brought under 42 U.S.C. § 1983. 547 U.S. at 580. The Sixth Circuit, relying on Hill and Nelson v. Campbell, 541 U.S. 637 (2004), ruled "that § 1983 proceedings are the proper means of a challenging a lethal injection protocol. These are not claims that sound in habeas." Cooey v. Strickland, 489 F.3d 775, 776 (6th Cir. 2007). Prior to Hill, the Sixth Circuit barred method-of-execution claims brought pursuant to 42 U.S.C. § 1983 holding that these challenges sounded in habeas. Cooey v. Strickland, 479 F.3d 412, 425-26 (6th Cir. 2007).

petitioner have been rejected by Tennessee's appellate courts on numerous occasions.  We agree on all points.

Hall, 2005 WL 22951, at *38.

Petitioner contends, based on Harris v. Reed, 489 U.S. 255 (1989), that the claim must be reviewed on the merits because the Tennessee Court of Criminal Appeals' opinion does not contain a plain statement on which this Court can base a ruling of procedural default.  (D.E. 100 at 133.)  The Court finds that the Tennessee Court of Criminal Appeals' decision appears to be a sufficiently clear statement to warrant a finding of a procedural bar.  Scott, 209 F.3d at 877; Coe, 161 F.3d at 330-31.  The ruling raises an independent and adequate state procedural bar to this Court's consideration of the claim.  See King v. Bell, 392 F. Supp. 2d 964, 1013 (M.D. Tenn. 2005) (finding that the state court, by determining that a claim had been waived, had erected an independent and adequate procedural bar to the habeas court's consideration of the claim).

The claim is procedurally defaulted.

Claim 19 is DENIED.

T.  Cumulative error (Claim 20)

Petitioner alleges that "[t]o the extent this Court finds two or more constitutional errors, yet determines that those errors are individually harmless, the cumulative effect of those errors renders Mr. Hall's conviction and/or death sentence unconstitutional."  (D.E. 15 at 73.)  Because he has not

129

established any error of consequence in his state criminal proceedings, the cumulative effect of those alleged deficiencies is likewise insufficient to merit federal habeas relief.  See Baze v. Parker, 371 F.3d 310, 330 (6th Cir. 2004), cert. denied, 544 U.S. 931 (2005) (denying habeas relief because petitioner could not establish any errors other than harmless error).  Furthermore, the Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief.  Lorraine, 291 F.3d at 447; see Scott v. Elo, 302 F.3d 598, 607 (6th Cir. 2002), cert. denied, 538 U.S. 995 (2003) ("The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief.").

Claim 20 is DENIED.

U.  Conclusion

Because Petitioner's claims are either noncognizable, devoid of substantive merit, or procedurally barred, disposition of this petition without an evidentiary hearing is proper.  Rule 8(a), Section 2254 Rules.  The petition is DENIED in its entirety and DISMISSED.[35]  Petitioner's request for oral argument is DENIED.

V.  APPELLATE ISSUES

The Court must also determine whether to issue a certificate of appealability ("COA").  Twenty-eight U.S.C. § 2253(a) requires a district court to evaluate the appealability of its decision dismissing a § 2254 habeas petition and to issue a COA only if "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); see also Fed. R. App. P. 22(b); Lyons v. Ohio Adult Parole Auth., 105 F.3d 1063, 1073 (6th Cir. 1997), cert. denied, 520 U.S. 1224 (1997) (district judges may issue COAs).  No § 2254 petitioner may appeal without this certificate.

In Slack v. McDaniel, 529 U.S. 473, 483-84 (2000), the Supreme Court stated that § 2253 is a codification of the standard announced in Barefoot v. Estelle, 463 U.S. 880, 893 (1983), which requires a showing that "reasonable jurists could debate whether

---

[35]The Court accepted Respondent's arguments in his motion for summary judgment on Claims 2 and 5-20, and the motion is GRANTED as to these claims. Though the Court denied habeas relief as to Claims 1, 3 and 4, relief was denied for reasons other than those stated in Respondent's motion for summary judgment. To that extent, Respondent's motion for summary judgment is DENIED as to Claims 1, 3 and 4.

(or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack, 529 U.S. at 484 (quoting Barefoot, 463 U.S. at 893 & n.4).

The Supreme Court has cautioned against undue limitations on the issuance of COAs:

> [O]ur opinion in Slack held that a COA does not require a showing that the appeal will succeed. Accordingly, a court of appeals should not decline the application of a COA merely because it believes the applicant will not demonstrate an entitlement to relief. The holding in Slack would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. After all, when a COA is sought, the whole premise is that the prisoner "'has already failed in that endeavor.'"

Miller-El v. Cockrell, 537 U.S. 322, 337 (2003) (quoting Barefoot, 463 U.S. at 893 n.4). Thus,

> [a] prisoner seeking a COA must prove "'something more than the absence of frivolity'" or the existence of mere "good faith" on his or her part. . . . We do not require petitioners to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.

Id. at 338 (quoting Barefoot, 463 U.S. at 893); see also Miller-El, 537 U.S. at 342 (cautioning courts against conflating their analysis of the merits with the decision of whether to issue a COA;

"[t]he question is the debatability of the underlying constitutional claim, not the resolution of that debate.").[36]

In this case, the issues presented by Petitioner's petition are without merit for the reasons previously stated. Because he cannot present a question of some substance about which reasonable jurists could differ, the Court DENIES a COA.

The Sixth Circuit has held that the Prison Litigation Reform Act of 1995, 28 U.S.C. § 1915(a)-(b), does not apply to appeals of orders denying § 2254 petitions. Kincaid v. Sparkman, 117 F.3d 949, 951 (6th Cir. 1997). Rather, to appeal in forma pauperis in a § 2254 case, and thereby avoid the $455 appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, Petitioner must seek permission from the district court under Federal Rule of Appellate Procedure 24(a). Kincade, 117 F.3d at 952. Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). However, Rule 24(a) also provides that, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal in forma pauperis, Petitioner must file his motion to proceed in forma pauperis in the appellate court. See Fed. R. App. P. 24(a) (4)-(5).

---

[36]The Supreme Court also emphasized that "[o]ur holding should not be misconstrued as directing that a COA always must issue." Miller-El, 537 U.S. at 337. Instead, the COA requirement implements a system of "differential treatment of those appeals deserving of attention from those that plainly do not." Id.

Case 10-5658 Document 19-3 Filed 06/28/2010 Page 134

In this case, for the same reasons the Court denies a COA, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Rule 24(a) of the Federal Rules of Appellate Procedure, that any appeal in this matter would not be taken in good faith, and leave to appeal in forma pauperis is DENIED. If Petitioner files a notice of appeal, he must also pay the full $455 appellate filing fee or file a motion to proceed in forma pauperis and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days.

IT IS SO ORDERED this 14th day of April 2010.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE